# SATTERWHITE *v.* TEXAS

No. 86–6284.   Argued December 8, 1987—Decided May 31, 1988

O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, STEVENS, and SCALIA, JJ., joined. MARSHALL, J., filed an opinion concurring in part and concurring in the judgment, in which BRENNAN, J., joined, and in Part II of which BLACKMUN, J., joined, *post*, p. 260. BLACKMUN, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 267. KENNEDY, J., took no part in the consideration or decision of the case.

*Richard D. Woods*, by appointment of the Court, 484 U. S. 810, argued the cause for petitioner. With him on the brief was *Stephen Takas*.

*Charles A. Palmer*, Assistant Attorney General of Texas, argued the cause for respondent. With him on the brief were *Jim Mattox*, Attorney General, *F. Scott McCown* and *Paula C. Offenhauser*, Assistant Attorneys General, and *Mary F. Keller*, Executive Assistant Attorney.*

JUSTICE O'CONNOR delivered the opinion of the Court.

In *Estelle* v. *Smith*, 451 U. S. 454 (1981), we recognized that defendants formally charged with capital crimes have a Sixth Amendment right to consult with counsel before submitting to psychiatric examinations designed to determine their future dangerousness. The question in this case is whether it was harmless error to introduce psychiatric testimony obtained in violation of that safeguard in a capital sentencing proceeding.

---

*\*Julius L. Chambers, Joel Berger*, and *Anthony G. Amsterdam* filed a brief for the NAACP Legal Defense and Educational Fund, Inc., as *amicus curiae* urging reversal.

I

On March 15, 1979, petitioner John T. Satterwhite was charged with the capital crime of murdering Mary Francis Davis during a robbery. The next day, before Satterwhite was represented by counsel, the presiding District Judge granted the State's request for a psychological examination to determine Satterwhite's competency to stand trial, sanity at the time of the offense, and future dangerousness. 1 Record 2. Though the State's motion and the court's order were placed in the court file, Satterwhite was not served with copies of either. Psychologist Betty Lou Schroeder examined Satterwhite pursuant to the court's order.

Satterwhite was indicted on April 4. The trial court appointed counsel to represent him and sent a copy of the appointment letter to the Bexar County District Attorney. App. 10. Satterwhite was arraigned on April 13. On April 17, the District Attorney filed a second motion requesting a psychiatric evaluation of Satterwhite's competency to stand trial, sanity at the time of the crime, and future dangerousness. App. 12. The District Attorney did not serve defense counsel with a copy of this motion. The next day, without determining whether defense counsel had been notified of the State's motion, the trial court granted the motion and ordered the Sheriff to produce Satterwhite for examination by psychologist Betty Lou Schroeder and psychiatrist John T. Holbrook. The record does not reveal when the court's order was placed in the court file.[1]

On May 18, a letter to the trial court from psychiatrist James P. Grigson, M. D., appeared in the court file. Dr.

---

[1] The Assistant Attorney General represented at oral argument that the trial court's order was stamped with the Clerk's stamp showing that it was filed on April 18. Tr. of Oral Arg. 22. The copy of the April 18 order contained in the record before us, however, contains no such stamp. 1 Record 23. Defense counsel informs us that although he examined the court file twice, he did not discover the April 18 order until mid-May. Tr. of Oral Arg. 7.

Grigson wrote that, pursuant to court order, he had examined Satterwhite on May 3, 1979, in the Bexar County Jail. He further reported that, in his opinion, Satterwhite has "a severe antisocial personality disorder and is extremely dangerous and will commit future acts of violence." App. 15–16.

Satterwhite was tried by jury and convicted of capital murder. In accordance with Texas law, a separate proceeding was conducted before the same jury to determine whether he should be sentenced to death or to life imprisonment. See Tex. Code Crim. Proc. Ann., Art. 37.071(a) (Vernon Supp. 1988). The State produced Dr. Grigson as a witness in support of its case for the death penalty. Over defense counsel's objection, Dr. Grigson testified that, in his opinion, Satterwhite presented a continuing threat to society through acts of criminal violence.

At the conclusion of the evidence, the court instructed the jury to decide whether the State had proved, beyond a reasonable doubt, (1) that "the conduct of the defendant that caused the death [was] committed deliberately and with the reasonable expectation that the death of [the victim] would result," and (2) that there is "a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." App. 33. Texas law provides that if a jury returns affirmative findings on both special verdict questions, "the court shall sentence the defendant to death." Tex. Code Crim. Proc. Ann., Art. 37.071(e) (Vernon Supp. 1988). The jury answered both questions affirmatively, and the trial court sentenced Satterwhite to death.

Satterwhite appealed his death sentence, arguing that the admission of Dr. Grigson's testimony violated the Sixth Amendment right to assistance of counsel recognized in *Estelle* v. *Smith, supra.* The Texas Court of Criminal Appeals agreed but concluded that the error was harmless because an average jury would have found the properly admitted evidence sufficient to sentence Satterwhite to death. 726 S. W. 2d 81, 92–93 (1986). The court acknowledged our holding

that a Sixth Amendment violation tainting an entire criminal proceeding can never be considered harmless, *Holloway* v. *Arkansas,* 435 U. S. 475 (1978), but reasoned that a *per se* rule of reversal is inappropriate where, as here, the error relates only to the admission of particular evidence.   726 S. W. 2d, at 93, n. 5.   We granted certiorari to decide whether harmless error analysis applies to violations of the Sixth Amendment right set out in *Estelle* v. *Smith.*   482 U. S. 905 (1987).

## II

The controversy in *Estelle* v. *Smith, supra,* also centered on the expert testimony of Dr. James P. Grigson.   In that case, as in this, Dr. Grigson appeared as a witness for the State in a capital sentencing proceeding and testified that the defendant was a severe sociopath who would continue to commit violent crimes in the future.   He based his testimony upon a psychiatric examination of the defendant that he had conducted pursuant to court order.   The problem in the case was that defense counsel were not given advance notice that Dr. Grigson's psychiatric examination, encompassing the issue of their client's future dangerousness, would take place. We recognized that, for a defendant charged with a capital crime, the decision whether to submit to a psychiatric examination designed to determine his future dangerousness is " 'literally a life or death matter' " which the defendant should not be required to face without " 'the guiding hand of counsel.' "   451 U. S., at 471, quoting *Smith* v. *Estelle,* 602 F. 2d 694, 708 (CA5 1979), and *Powell* v. *Alabama,* 287 U. S. 45, 69 (1932).   We held that defense counsel must be given advance notice of such an examination.

The Texas Court of Criminal Appeals determined that the Sixth Amendment notice requirement set out in *Estelle* v. *Smith* was not met in this case, and we agree.   Since Satterwhite's indictment, arraignment, and appointment of counsel had all occurred before Dr. Grigson examined him in the Bexar County Jail, it is clear that his Sixth Amendment right

to counsel had attached at the time. See *Estelle*, 451 U. S., at 469; *Kirby* v. *Illinois*, 406 U. S. 682, 688–689 (1972). The State does not contest the lower court's finding that Satterwhite did not waive his right to consult with his attorney before participating in the psychiatric examination. The State contends, however, that various *ex parte* motions and orders contained in the court file provided defense counsel with notice that an examination encompassing the issue of his client's future dangerousness would take place.[2]

We note preliminarily that the applicability and timing of some of these filings are disputed: the record does not contain a court order authorizing Dr. Grigson to examine Satterwhite, 726 S. W. 2d, at 92; and, as we have already noted, it is unclear whether the April 18 order appointing Drs. Schroeder and Holbrook was placed in the court file before Dr. Grigson performed his examination. See n. 1, *supra*. Yet even if the *ex parte* orders and filings were timely and were applicable to Dr. Grigson's examination, we agree with the Texas Court of Criminal Appeals that they did not adequately notify defense counsel that Dr. Grigson would examine the defendant to assess his future dangerousness. The Court of Criminal Appeals did not find that defense counsel had actual knowledge of the motion and order for the psychiatric examination. The State has cited no authority for its proposition that constructive notice to defense counsel achieved by mere placement of the State's motions and the court's *ex parte* orders in the court file satisfies the Sixth Amendment, and we hold that it does not. Accordingly, like the Texas Court of Criminal Appeals, we conclude that the use of Dr. Grigson's

---

[2] The State points to the following documents in the record: (1) the State's March 16 motion for a psychological examination, App. 3–4; (2) the court's March 16 order granting that motion and appointing Dr. Betty Lou Schroeder to examine Satterwhite, *id.*, at 5; (3) the State's April 17 motion for a psychiatric examination to be conducted by Drs. Holbrook and Schroeder, *id.*, at 12–13; and (4) the court's April 18 order granting that motion, *id.*, at 14.

testimony at the capital sentencing proceeding on the issue of future dangerousness violated the Sixth Amendment.

Our conclusion does not end the inquiry because not all constitutional violations amount to reversible error. We generally have held that if the prosecution can prove beyond a reasonable doubt that a constitutional error did not contribute to the verdict, the error is harmless and the verdict may stand. *Chapman* v. *California*, 386 U. S. 18, 24 (1967). The harmless error rule "'promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.'" *Rose* v. *Clark*, 478 U. S. 570, 577 (1986) (quoting *Delaware* v. *Van Arsdall*, 475 U. S. 673, 681 (1986)).

Some constitutional violations, however, by their very nature cast so much doubt on the fairness of the trial process that, as a matter of law, they can never be considered harmless. Sixth Amendment violations that pervade the entire proceeding fall within this category. See *Holloway* v. *Arkansas*, 435 U. S. 475 (1978) (conflict of interest in representation throughout entire proceeding); *Chapman, supra,* at 23, n. 8 (citing *Gideon* v. *Wainwright*, 372 U. S. 335 (1963) (total deprivation of counsel throughout entire proceeding)); *White* v. *Maryland*, 373 U. S. 59 (1963) (absence of counsel from arraignment proceeding that affected entire trial because defenses not asserted were irretrievably lost); *Hamilton* v. *Alabama*, 368 U. S. 52 (1961) (same). Since the scope of a violation such as a deprivation of the right to conflict-free representation cannot be discerned from the record, any inquiry into its effect on the outcome of the case would be purely speculative. As explained in *Holloway:*

> "In the normal case where a harmless-error rule is applied, the error occurs at trial and its scope is readily identifiable. Accordingly, the reviewing court can undertake with some confidence its relatively narrow task of assessing the likelihood that the error materially affected the deliberations of the jury. But in a case of

joint representation of conflicting interests the evil—it bears repeating—is in what the advocate finds himself compelled to *refrain* from doing, not only at trial but also as to possible pretrial plea negotiations and in the sentencing process. . . . Thus, any inquiry into a claim of harmless error here would require, unlike most cases, unguided speculation." 435 U. S., at 490–491 (citations omitted).

Satterwhite urges us to adopt an automatic rule of reversal for violations of the Sixth Amendment right recognized in *Estelle* v. *Smith.* He relies heavily upon the statement in *Holloway* that "when a defendant is deprived of the presence and assistance of his attorney, either throughout the prosecution or during a critical stage in, at least, the prosecution of a capital offense, reversal is automatic. *Gideon* v. *Wainwright,* 372 U. S. 335 (1963); *Hamilton* v. *Alabama,* 368 U. S. 52 (1961); *White* v. *Maryland,* 373 U. S. 59 (1963)." 435 U. S., at 489. His reliance is misplaced, however, for *Holloway, Gideon, Hamilton,* and *White* were all cases in which the deprivation of the right to counsel affected—and contaminated—the entire criminal proceeding. In this case, the effect of the Sixth Amendment violation is limited to the admission into evidence of Dr. Grigson's testimony. We have permitted harmless error analysis in both capital and noncapital cases where the evil caused by a Sixth Amendment violation is limited to the erroneous admission of particular evidence at trial. In *Milton* v. *Wainwright,* 407 U. S. 371 (1972), for example, the Court held the admission of a confession obtained in violation of *Massiah* v. *United States,* 377 U. S. 201 (1964), to be harmless beyond a reasonable doubt. And we have held that harmless error analysis applies to the admission of identification testimony obtained in violation of the right to counsel at a postindictment lineup. *Moore* v. *Illinois,* 434 U. S. 220 (1977); *Gilbert* v. *California,* 388 U. S. 263 (1967) (capital case); *United States* v. *Wade,* 388 U. S. 218 (1967). Just last year we indicated that harm-

less error analysis would apply in a noncapital case to constitutional error in the use of a psychological evaluation at trial. *Buchanan* v. *Kentucky*, 483 U. S. 402, 425, n. 21 (1987).

It is important to avoid error in capital sentencing proceedings. Moreover, the evaluation of the consequences of an error in the sentencing phase of a capital case may be more difficult because of the discretion that is given to the sentencer. Nevertheless, we believe that a reviewing court can make an intelligent judgment about whether the erroneous admission of psychiatric testimony might have affected a capital sentencing jury. Accordingly, we hold that the *Chapman* harmless error rule applies to the admission of psychiatric testimony in violation of the Sixth Amendment right set out in *Estelle* v. *Smith*.

## III

Applying the *Chapman* harmless error test, we cannot agree with the Court of Criminal Appeals that the erroneous admission of Dr. Grigson's testimony was harmless beyond a reasonable doubt. A Texas court can sentence a defendant to death only if the prosecution convinces the jury, beyond a reasonable doubt, that "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex. Code Crim. Proc. Ann., Art. 37.071(b)(2) (Vernon Supp. 1988). The Court of Criminal Appeals thought that the admission of Dr. Grigson's expert testimony on this critical issue was harmless because "the properly admitted evidence was such that the minds of an average jury would have found the State's case [on future dangerousness] sufficient . . . even if Dr. Grigson's testimony had not been admitted." 726 S. W. 2d, at 93. The question, however, is not whether the legally admitted evidence was sufficient to support the death sentence, which we assume it was, but rather, whether the State has proved "beyond a reasonable doubt that the error complained of did

not contribute to the verdict obtained." *Chapman*, 386 U. S., at 24.

The evidence introduced at sentencing showed that, in addition to his conviction in this case, Satterwhite had four prior convictions of crimes ranging from aggravated assault to armed robbery. Eight police officers testified that Satterwhite's reputation for being a peaceful and law-abiding citizen was bad, and Satterwhite's mother's former husband testified that Satterwhite once shot him during an argument. The State also introduced the testimony of Bexar County psychologist Betty Lou Schroeder.[3] Dr. Schroeder testified that she found Satterwhite to be a "cunning individual" and a "user of people," with an inability to feel empathy or guilt. She testified that in her opinion, Satterwhite would be a continuing threat to society through acts of criminal violence. App. 55–56.

Dr. Grigson was the State's final witness. His testimony stands out both because of his qualifications as a medical doctor specializing in psychiatry and because of the powerful content of his message. Dr. Grigson was the only licensed physician to take the stand. He informed the jury of his educational background and experience, which included teaching psychiatry at a Dallas medical school and practicing psychiatry for over 12 years. He stated unequivocally that, in his expert opinion, Satterwhite "will present a continuing threat to society by continuing acts of violence." He explained that Satterwhite has "a lack of conscience" and is "as severe a sociopath as you can be." To illustrate his point, he testified that on a scale of 1 to 10—where "ones" are mild sociopaths and "tens" are individuals with complete disregard for human life—Satterwhite is a "ten plus." Dr. Grigson concluded his testimony on direct examination with perhaps his most dev-

---

[3] Satterwhite now contends that Dr. Schroeder's testimony was also admitted in violation of *Estelle* v. *Smith*, 451 U. S. 454 (1981). The Texas Court of Criminal Appeals explicitly noted that this claim was not raised at trial or on appeal, and we decline to consider it.

astating opinion of all: he told the jury that Satterwhite was beyond the reach of psychiatric rehabilitation. *Id.*, at 72–73.

The District Attorney highlighted Dr. Grigson's credentials and conclusions in his closing argument:

> "Doctor James Grigson, Dallas psychiatrist and medical doctor. And he tells you that on a range from 1 to 10 he's ten plus. Severe sociopath. Extremely dangerous. A continuing threat to our society. Can it be cured? Well, it's not a disease. It's not an illness. That's his personality. That's John T. Satterwhite." 8 Record 2725–2726.

The finding of future dangerousness was critical to the death sentence. Dr. Grigson was the only psychiatrist to testify on this issue, and the prosecution placed significant weight on his powerful and unequivocal testimony. Having reviewed the evidence in this case, we find it impossible to say beyond a reasonable doubt that Dr. Grigson's expert testimony on the issue of Satterwhite's future dangerousness did not influence the sentencing jury. Accordingly, we reverse the judgment of the Texas Court of Criminal Appeals insofar as it affirms the death sentence, and we remand the case for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE KENNEDY took no part in the consideration or decision of this case.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins and with whom JUSTICE BLACKMUN joins as to Part II, concurring in part and concurring in the judgment.

## I

I agree with the Court that the psychiatric examination on which Dr. Grigson testified at the capital sentencing proceeding was in bald violation of *Estelle* v. *Smith*, 451 U. S. 454

(1981), and that petitioner's death sentence should be vacated. I write separately because I believe the Court errs in applying harmless-error analysis to this Sixth Amendment violation. It is my view that the unique nature of a capital sentencing determination should cause this Court to be especially hesitant ever to sanction harmless-error review of constitutional errors that taint capital sentencing proceedings, and even if certain constitutional errors might properly be subject to such harmless-error analysis, a violation of *Estelle* v. *Smith* is not such an error.

Until today's ruling, this Court never had applied harmless-error analysis to constitutional violations that taint the sentencing phase of a capital trial. In deciding to apply harmless-error analysis to the Sixth Amendment violation in this case, I believe the Court fails to adequately consider the unique nature of a capital sentencing proceeding and a sentencer's decision whether a defendant should live or die. The Court's analysis is also flawed in that it fails to accord any noticeable weight to the qualitative difference of death from all other punishments.

Unlike the determination of guilt or innocence, which turns largely on an evaluation of objective facts, the question whether death is the appropriate sentence requires a profoundly moral evaluation of the defendant's character and crime. See *California* v. *Brown*, 479 U. S. 538, 545 (1987) (O'CONNOR, J., concurring) (a death sentence should "reflect a reasoned *moral* response to the defendant's background, character, and crime"); *Enmund* v. *Florida*, 458 U. S. 782, 801 (1982) (capital defendant's "punishment must be tailored to his personal responsibility and moral guilt"). Moreover, although much of the Court's capital jurisprudence since *Furman* v. *Georgia*, 408 U. S. 238 (1972), has been focused on guiding and channeling the decision whether death is the appropriate sentence in a specific case, the sentencer nonetheless is afforded substantial discretion. See, *e. g.*, *McCleskey* v. *Kemp*, 481 U. S. 279, 304–306 (1987); *Woodson* v.

*North Carolina,* 428 U. S. 280 (1976). Even in the face of overwhelming aggravating evidence, the sentencer has discretion to act with leniency and refuse to impose the death sentence. See *McCleskey, supra,* at 311 ("[D]iscretionary exercises of leniency [by the sentencer] are final and unreviewable").

Because of the moral character of a capital sentencing determination and the substantial discretion placed in the hands of the sentencer, predicting the reaction of a sentencer to a proceeding untainted by constitutional error on the basis of a cold record is a dangerously speculative enterprise. As the Court recognized in *Caldwell* v. *Mississippi,* 472 U. S. 320, 330 (1985), "[w]hatever intangibles a jury might consider in its sentencing determination, few can be gleaned from an appellate record." In the same vein, an appellate court is ill equipped to evaluate the effect of a constitutional error on a sentencing determination. Such sentencing judgments, even when guided and channeled, are inherently subjective, and the weight a sentencer gives an instruction or a significant piece of evidence that is later determined to violate a defendant's constitutional rights is nowhere apparent in the record. In *McCleskey* v. *Kemp, supra,* the Court acknowledged that "[i]ndividual jurors bring to their deliberations 'qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable,'" and their collective judgment of the appropriate sentence is marked by an "inherent lack of predictability." *Id.,* at 311, quoting *Peters* v. *Kiff,* 407 U. S. 493, 503 (1972) (opinion of MARSHALL, J.). The threat of an erroneous harmless-error determination thus looms much larger in the capital sentencing context than elsewhere.

That threat is of particular concern because of the unique nature of the death sentence. The awesome severity of a sentence of death makes it qualitatively different from all other sanctions. See, *e. g., Lockett* v. *Ohio,* 438 U. S. 586, 605 (1978) (plurality opinion). For this reason, the Court has

emphasized the greater need for reliability in capital cases, and has required that "capital proceedings be policed at all stages by an especially vigilant concern for procedural fairness and for the accuracy of factfinding." *Strickland* v. *Washington*, 466 U. S. 668, 704 (1984) (BRENNAN, J., concurring in part and dissenting in part); see *California* v. *Ramos*, 463 U. S. 992, 998–999 (1983) ("[T]he qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination"). Because of this heightened concern for reliability, "[t]ime and again the Court has condemned procedures in capital cases that might be completely acceptable in an ordinary case." *Barefoot* v. *Estelle*, 463 U. S. 880, 913 (1983) (MARSHALL, J., dissenting). Harmless-error analysis impinges directly on the reliability of the capital sentencing decision by allowing a court to substitute its judgment of what the sentencer would have done in the absence of constitutional error for an actual judgment of the sentencer untainted by constitutional error.

I therefore have serious doubts whether a constitutional error that infects the sentencing phase of a capital case ever may be considered harmless beyond a reasonable doubt. But even if I could agree that harmless-error analysis is appropriate for certain constitutional errors at the sentencing phase, such a situation is not presented when the error is a violation of the Sixth Amendment under *Estelle* v. *Smith*.

## II

As an initial matter, the Court in *Estelle* v. *Smith* gave no hint that harmless-error analysis ever could apply to the admission of psychiatric testimony in a capital sentencing proceeding which was based on an examination of the defendant conducted in violation of his Sixth Amendment right to counsel. After finding constitutional error, the Court simply vacated the death sentence. See 451 U. S., at 473. The failure of the Court to engage in harmless-error analysis

in *Smith* is understandable, because the factors on which this Court traditionally has focused to determine whether harmless-error review is appropriate make clear that an *Estelle* v. *Smith* violation that taints a capital sentencing proceeding should lead to automatic reversal. First, the potential for actual prejudice resulting from such a violation of *Smith* is so high that a "case-by-case inquiry into prejudice is not worth the cost." *Strickland* v. *Washington, supra,* at 692. As evidenced in this case, psychiatric testimony is generally of critical importance to the sentencing determination, covering issues of rehabilitative potential, future dangerousness, and individual culpability.[1] Moreover, psychiatric testimony on these issues is clothed with a scientific authority that often carries great weight with lay juries. Cf. *Ake* v. *Oklahoma,* 470 U. S. 68, 79 (1985) (recognizing "pivotal role" psychiatry has come to play in criminal proceedings).

Second, it is difficult, if not impossible, to accurately measure the degree of prejudice arising from the failure to notify defense counsel of an impending psychiatric examination and the subsequent admission at the sentencing phase of evidence acquired from the examination. Cf. *Hamilton* v. *Alabama,* 368 U. S. 52, 55 (1961) (rejecting harmless-error analysis where "the degree of prejudice can never be known"); *Holloway* v. *Arkansas,* 435 U. S. 475, 490–491 (1978) ("[A]n inquiry into a claim of harmless error [in a case involving defense counsel's conflict of interests] would require, unlike

---

[1] The likelihood of actual prejudice arising from the illegal admission of psychiatric testimony is even greater in the context of this case. The Texas capital sentencing statute provides that, in the absence of evidence of provocation by the victim, the court "shall sentence the defendant to death" if the jury finds that the murder was "committed deliberately and with the reasonable expectation that the death of the deceased . . . would result," and that "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex. Code Crim. Proc. Ann., Art. 37.071 (Vernon Supp. 1988). The psychiatrist's evaluation of future dangerousness thus purports to answer one of two questions posed by the statute.

most cases, unguided speculation"). As I discussed above, the decision whether a defendant should live or die is a discretionary, moral judgment involving a balancing of often intangible factors. Divining the effect of psychiatric testimony on a sentencer's determination whether death is an appropriate sentence is thus more in the province of soothsayers than appellate judges. In addition, contrary to the Court's claim, see *ante*, at 257, the prejudice arising from an *Estelle* v. *Smith* violation is not limited to the illegal admission of psychiatric testimony. If defense counsel is properly notified under *Smith* of the State's intention to perform a psychiatric examination, the course of subsequent proceedings may be altered significantly. For instance, defense counsel might extensively prepare his client for the examination, or perhaps advise his client to refuse to participate in the examination by the particular psychiatrist; defense counsel also might urge that a different psychiatrist perform the examination. Cf. *Estelle* v. *Smith*, 451 U. S., at 471 (defendant "was denied the assistance of his attorneys in making the significant decision of whether to submit to the examination and to what end the psychiatrist's findings could be employed"). I therefore believe that any attempt to predict the effect of such an *Estelle* v. *Smith* violation would require the appellate court to engage in unguided speculation. The confluence of these factors—the likelihood of prejudice and the difficulty in evaluating the degree of that prejudice—together with the heightened concern for reliability in capital cases, convinces me that a psychiatric examination conducted in violation of *Estelle* v. *Smith*, and the later admission at a capital sentencing proceeding of psychiatric testimony based on this examination, may never be considered harmless error.[2]

---

[2] It is also important to note that a violation of petitioner's Sixth Amendment right to counsel under *Estelle* v. *Smith* is easy to identify and, "for that reason and because the prosecution is directly responsible, easy for the government to prevent." *Strickland* v. *Washington*, 466 U. S. 668, 692 (1984). Because the error is in the control of the State and is easy to

I would have thought that this Court's decision in *Holloway* v. *Arkansas, supra,* already had settled the question whether an *Estelle* v. *Smith* violation in a capital case can ever be harmless error. In *Holloway* we stated: "'The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial.' . . . Accordingly, when a defendant is deprived of the presence and assistance of his attorney, either throughout the prosecution or during a critical stage in, at least, the prosecution of a capital offense, reversal is automatic." 435 U. S., at 488–489, quoting *Glasser* v. *United States,* 315 U. S. 60, 76 (1942). We stated in *Estelle* v. *Smith, supra,* that a pretrial examination by a state psychiatrist of a capital defendant is a "critical stage" in a capital case. *Id.,* at 470. As the Court recognized in that case, "the decision to be made regarding the proposed psychiatric evaluation is 'literally a life or death matter' and is 'difficult . . . even for an attorney' because it requires 'a knowledge of what other evidence is available, of the particular psychiatrist's biases and predilections, [and] of possible alternative strategies at the sentencing hearing.'" *Id.,* at 471, quoting *Smith* v. *Estelle,* 602 F. 2d 694, 708 (CA5 1979).

The Court attempts to distinguish *Holloway* by arguing that in that case the "deprivation of the right to counsel affected—and contaminated—the entire criminal proceeding." *Ante,* at 257. But *Holloway* anticipated automatic reversal not only when the deprivation affected the entire proceeding, but also when the deprivation occurred during a "critical *stage* in, at least, the prosecution of a capital offense." 435 U. S., at 489 (emphasis added). By focusing on whether the error occurred in a capital case, *Holloway* exhibited an apprecia-

---

prevent, holding that such a violation will result in automatic reversal does not pose a significant burden on the State.

tion of the heightened concern for reliability in this context — something I believe today's decision fails to recognize.[3]

In the end, the Court principally relies on its belief "that a reviewing court can make an intelligent judgment about whether the erroneous admission of psychiatric testimony might have affected a capital sentencing jury." *Ante*, at 258. I do not possess the same confidence in an appellate court's ability to divine the prejudice arising from such a significant error in a capital sentencing proceeding. In my view, the speculation engendered by harmless-error review of a violation of *Estelle* v. *Smith* in the context of a capital sentencing proceeding presents an intolerable danger that the death sentence will be administered erroneously. Accordingly, I do not join in that aspect of the Court's opinion sanctioning harmless-error analysis for violations of *Estelle* v. *Smith*.

JUSTICE BLACKMUN, concurring in part and concurring in the judgment.

I join Part II of JUSTICE MARSHALL's concurring opinion because I agree that harmless-error analysis is inappropriate where the error is a Sixth Amendment violation under *Estelle* v. *Smith*, 451 U. S. 454 (1981), which results in the erroneous admission of psychiatric testimony in a capital-sentencing proceeding. The situation is particularly acute where, under a system such as that of Texas, the jury must answer the very question that the psychiatrist purports to

---

[3] Moreover, in the present case the Court is unable to cite a single capital case since our decision in *Furman* v. *Georgia*, 408 U. S. 238 (1972), in which we have ignored *Holloway*'s reasoning and have applied harmless-error analysis to a Sixth Amendment violation occurring during a critical stage of the proceedings. The Court cites dicta in *Buchanan* v. *Kentucky*, 483 U. S. 402, 425, n. 21 (1987), as an indication of the Court's willingness to apply harmless-error analysis to the admission of psychological testimony in violation of *Estelle* v. *Smith*, 451 U. S. 454 (1981). But the petitioner in *Buchanan* was not prosecuted for a capital offense, and thus the Court's indication in that case that harmless-error analysis might apply to the illegal admission of psychological testimony has little relevance in the present context.

answer.   I am fortified in this conclusion by my continuing concern—wholly apart from the testimony of the ubiquitous Doctor Grigson in Texas capital cases—about the reliability of psychiatric testimony as to a defendant's future dangerousness (wrong two times out of three).   See *Barefoot* v. *Estelle*, 463 U. S. 880, 916 (1983) (dissenting opinion).