

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-10-2002

# Re v. Snyder

Precedential or Non-Precedential: Precedential

Docket No. 98-5458

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Re v. Snyder" (2002). *2002 Decisions.* Paper 334.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/334

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed June 10, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-5458

ROGER RE,
Appellant

v.

ROBERT SNYDER; M. JANE BRADY

On Appeal From The United States District Court
for the District of Delaware
(D.C. Civil No. 95-cv-00363)

District Judge: The Honorable Roderick R. McKelvie

Argued January 22, 2002

Before: NYGAARD and STAPLETON, Circuit Judges ,
and CAPUTO,* District Judge

(Filed: June 10, 2002)

Andrew Grosso, Esquire (argued)
2121 K Street, N.W.
Suite 800
Washington, D.C. 20037
 Counsel for Appellant

_____

* Honorable A. Richard Caputo, District Judge for the United States
District Court for the Middle District of Pennsylvania, sitting by
designation.

Loren C. Meyers, Esquire (argued)
Delaware Department of Justice
State Office Building
820 North French Street
Wilmington, DE 19801
 Counsel for Appellees

OPINION OF THE COURT

CAPUTO, District Judge:

Appellant, Roger Re ("Re"), was convicted of the first
degree murder of his wife. He was sentenced to life without
parole on the murder charge.1 He sought to defend the
charge with the partial defense of extreme emotional
distress,2 and he presented two psychiatrists who testified
in his defense. On rebuttal, the trial court permitted the
testimony of a state retained psychiatrist on the issue of

Re's malingering. Re assigned this as error in the course of his appeal and his petition for post conviction relief, each of which was resolved against him. Re filed a Petition for Writ of Habeas Corpus in the United States District Court for the District of Delaware on May 19, 1995. On January 6, 1998, the District Court denied the petition, later issued a certificate of appealability, and this appeal followed. For the reasons which follow, we will affirm.

_____

1. He was also convicted of possession of a deadly weapon during the commission of a felony and possession of a destructive weapon.

2. Under Delaware law, the fact that the accused intentionally caused the death of another person under the influence of extreme emotional distress is a mitigating circumstance, reducing Murder in the First Degree to Manslaughter. The defendant must prove that he acted under the influence of extreme emotional distress by a preponderance of the evidence and that there is a "reasonable explanation or excuse" for his extreme emotional distress. The reasonableness of the explanation or excuse shall be determined from the viewpoint of a reasonable person in the defendant's situation under the circumstances as he believed them to be. See State v. Moyer, 387 A.2d 194 (Del. 1978).

2

I.

Since this is a habeas corpus petition and the District Court did not hold an evidentiary hearing, our review is plenary. Robinson v. Arvonio, 27 F.3d 877, 883 (3d Cir. 1994), vacated on other grounds, 513 U.S. 1186 (1995). See also, Yohn v. Love, 76 F.3d 508, 515 (3d Cir. 1994) ("In a habeas corpus proceeding, the district court's legal conclusions are subject to plenary review, but factual conclusions are subject to review for clear error only; when, however, the District Court does not hold an evidentiary hearing and engage in independent factfinding and the habeas evidence is limited to that contained in the state court record, our review of the district court's decision to grant petition is plenary.")

II.

Re and his late wife, Jayne, had a tumultuous relationship, and the two had appeared in court on several occasions as a result of domestic disputes. They separated in May, 1976. Re told an acquaintance that he was still in love with his wife and that if he ever caught her with another man, he would kill her.

On June 22, 1976, Re saw Jayne return home from a date with Michael Riley, an off-duty New Castle County police officer. Re entered the house through a front window. As Riley was leaving, he heard Jayne screaming that Re was in the house with a gun. Riley ran into the house. Re had two guns and was arguing with Jayne about their marriage. When Re moved to shoot Riley, Jayne informed Re that he was a police officer, and Re requested

identification, which was produced.

When the front doorbell rang, Re and Jayne moved towards the door, ordering Riley to stay in the kitchen. Riley went to the car to get his pistol, told a neighbor to call the police, and heard Jayne yell, followed by five shots in rapid succession. As he ran to the door, he heard a shotgun fire. Re climbed out of a window and disposed of the gun. Police determined that a gun found in a nearby garage was the gun used to kill Jayne. It had four live shells and one discharged shell in the revolver's cylinder.

3

Police determined that, based on the number of shots that Riley heard from the house, Re must have reloaded the gun. A sawed off shotgun was also found in the house. Re surrendered to investigators on June 23, 1976, and had a limited recollection of what occurred.

Re was indicted for first degree murder in July, 1976. Since his mental competency and mental condition were an issue at the time of the shooting, he was ordered transferred to the Delaware State Hospital, and the hospital was ordered to re-evaluate his mental condition every six months. In May, 1978, a judge found Re competent to stand trial, but in October, 1979, the Delaware Superior Court declared Re mentally incompetent to stand trial.

In 1984, the Attorney General for the State of Delaware requested that the hospital investigate Re's privileged confinement conditions because Re had allegedly manipulated certain hospital employees into granting him special hospital privileges while simultaneously being unresponsive to his doctors and counsel. The State retained Dr. Dietz, an outside expert, to conduct this inquiry. He examined Re once in November, 1984 and again in May, 1985. He then wrote a report in which he expressed the opinion that Re was malingering, and had been since 1982. Based in part on this finding, Re was declared competent to stand trial.

After Re was declared competent to stand trial, he asserted a partial defense of extreme emotional distress. He conceded that he had intentionally killed his wife, but claimed that he had acted under extreme emotional distress. Two clinical psychologists, Dr. Irwin G. Weintraub and Dr. Cono Galliani, testified for the defense at trial. Dr. Weintraub, who had examined Re twice (in 1975 and 1985), testified that Re was limited in his ability to cope with stress, noted the increasing intensity of the confrontations, and concluded that Re had overreacted when faced with an increasingly stressful and intolerable situation. He concluded that Re was under extreme emotional distress when he killed Jayne, though he had no mental illness or personality disorder.

Dr. Galliani, the chief psychologist at Delaware State Hospital, saw Re on several occasions, and interviewed Re

before and during trial at defense counsel's request. Dr. Galliani also concluded that, at the time of the homicide, Re was under extreme emotional distress. In prior interviews, Re had claimed no memory of the homicide and insisted that he did not kill Jayne, but in an interview three days into the trial, Re, under hypnosis, recalled the events surrounding the homicide.

In rebuttal, the prosecution called Dr. Dietz, who had not testified in the state's case-in-chief and was a surprise witness. The defense objected to Dr. Dietz's testimony on the ground that it violated the Sixth Amendment because Dr. Dietz had not notified counsel of his 1984 interview with Re. The objection was overruled. Dr. Dietz testified that Re was a "malingerer" with an "anti-social personality disorder." Dr. Dietz admitted that his malingering and anti-social tendencies were not relevant to the issue of extreme emotional distress, and indeed declined to express an opinion about the existence of extreme emotional distress, since the concept was a legal one and not a psychological or psychiatric one. Dr. Dietz conceded that he had marginal factual evidence to support his contention that Re was anti-social, and admitted that Re's malingering was unrelated to his mental condition at the time of the shooting.

Malingering is "the voluntary production of symptoms . . . The essential feature of malingering is the voluntary production and presentation of false or grossly exaggerated physical or psychological symptoms which are produced in pursuit of a goal that is obviously recognizable to evade criminal prosecution." (Dr. Dietz's testimony, Joint App. at 67-68.) Dr. Dietz gave examples in support of his contention that Re was feigning incompetence.3 The defense's objection to this line of examination was overruled. The trial judge ruled that the defense had opened that issue by calling Dr. Galliani as a witness. Since Dr. Galliani based his opinion upon his contact with Re in his role as the chief psychologist at Delaware State Hospital, Dr. Dietz was permitted to testify about

_____

3. The examples centered around the fact that Re did not appropriately respond to Dr. Dietz's questions, and uttered incoherent and nonsensical remarks.

information he obtained through his investigation of Re's conduct at the hospital, and his conclusions based on that information.

III.

This appeal involves whether or not Re's counsel had notice of Dr. Dietz's examination in conformity with the

Sixth Amendment to the United States Constitution; whether or not any notice he did receive was defective because it did not notify counsel of the "expanded scope" of the examination; and whether the lack of notice led to prejudicial rebuttal testimony by Dr. Dietz and created a structural defect in Re's trial. Re contends that counsel was not notified of the 1984 Dietz examination, and since the examination concerned a subject beyond his mental competency, viz malingering, his counsel should have been notified. Estelle v. Smith, 451 U.S. 454, 471 (1980); Powell v. Texas, 492 U.S. 680, 681-85 (1989); Satterwhite v. Texas, 486 U.S. 249, 254 (1988).

Re's counsel did not have a right, under the Sixth Amendment, to be present and observe the 1984 Dietz examination. Estelle, 451 U.S. at 471, n.14. Counsel, by virtue of the state court's 1983 standing order directing evaluations of Re's mental competency every six months, knew that Re would be subjected to continuing competency examinations. It was not outside of the scope of such examinations to consider whether or not Re was malingering. In addition, at a hearing in April 1985, after Dr. Dietz examined Re, Dr. Dietz testified as to his opinion that Re was a malingerer based on his 1984 examination. With defense counsel's consent, another examination by Dr. Dietz was held in May, 1985, but Re's counsel declined to attend. Therefore, Re's counsel had adequate notice of the examination for competence, and adequate notice that malingering would be relevant and foreseeably related to the issue of competency to stand trial.

Counsel likewise had notice of the Attorney General's investigation concerning Re's potential manipulation of hospital personnel. It is difficult to conclude that the subject of malingering was not within the overriding subject

6

of the periodic examinations, viz mental competence to stand trial. Whether Re was malingering was certainly related and within the scope of that subject. This is not the same situation presented by Estelle and Satterwhite. In Estelle, the examination was expanded to consider the defendant's future dangerousness to society, and it was to be used for the specific purpose of satisfying that element in the death penalty phase of sentencing. The Supreme Court held the failure to notify counsel of that subject violated the defendant's Sixth Amendment rights. Estelle, 451 U.S. at 463. In Satterwhite, the Supreme Court held that a judge's order for mental examinations in the case file was insufficient notice to defense counsel that he would be evaluated by psychiatrists, and violated the Sixth Amendment. Satterwhite, 486 U.S. at 256. Here, there was adequate notice, since his mental status had been at issue since his arrest, and there is no such additional purpose; whether Re was malingering was relevant to and part of the determination of his mental competence to stand trial, and it was an appropriate consideration in view of Dr. Galliani's reliance on interviews with Re conducted in the 1980's. His

credibility in those interviews is fairly called into question. Moreover, here counsel had notice there would be periodic psychiatric examinations to determine whether Re was competent to stand trial. The subject of malingering is fairly within the scope of such examination. Thus, the notice of the examination and its scope was satisfied, and there was no Sixth Amendment violation. Buchanan v. Kentucky, 483 U.S. 402, 425 (1987) (holding that Estelle put counsel on notice that, if he intended to raise a 'mental status' defense, he would have to anticipate the use of psychological evidence in rebuttal.)

Dr. Dietz's rebuttal testimony did not constitute a Sixth Amendment structural defect in the Re's trial. It did not contaminate the fairness of his trial.

At trial, Re put his mental state in issue with his own evaluations and expert psychiatric testimony. He therefore cannot challenge Dr. Dietz's rebuttal testimony on Sixth Amendment grounds. Buchanan, 483 U.S. at 425. Moreover, Dr. Dietz testified that his conclusions of malingering and anti-social disorder did not go to Re's

7

mental state at the time of the commission of the crime. The Sixth Amendment was not violated by these events at trial.

Re claims that the lack of notice of the Dietz examination and its scope effectively deprived him of his right to counsel under the Sixth Amendment, because counsel did not have the opportunity to change his strategy to eliminate the use of Dr. Galliani's testimony and simply rely on the testimony of Dr. Weintraub. This, of course, begs the question of the notice of the scope of the Dietz examination. Malingering was a fair subject to anticipate in the Dietz exam given the subject of competency to stand trial. Moreover, the 1985 examination, to which Re's counsel consented, made him aware, in advance of trial, of the results of the 1984 examination. Finally, we also hold that even if there was an error in this case, it was a harmless error and not a structural defect. See Satterwhite, 486 U.S. at 257-58. Reversals are limited to cases where the deprivation of the right to counsel affect and contaminate the entire criminal proceeding, and not cases involving the erroneous admission of particular evidence at trial. Id. at 157. It did not have a "substantial and injurious effect of influence on determining the jury's verdict." Brecht v. Amrahamson, 507 U.S. 619, 637 (1993); United States v. Khalil , 1999 WL 455698 at *2 (E.D. Pa. June 30, 1999). Therefore, since Re's arguments regarding notice and scope of the 1984 examination fail, the substantial defect argument fails as well.

The judgment of the District Court will be affirmed.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

8