IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 16, 2008

Charles R. Fulbruge III
Clerk

No. 06-70008

DAVID LEE POWELL

Petitioner - Appellant

v.

NATHANIEL QUARTERMAN, DIRECTOR, TEXAS DEPARTMENT OF
CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION

Respondent - Appellee

Appeal from the United States United States District Court for the Western
District of Texas, Austin
1:03-CV-456

Before JOLLY, DAVIS, and OWEN, Circuit Judges.

PER CURIAM:[*]

Following his third punishment trial in 1999, David Lee Powell was convicted and sentenced to death for the 1978 capital murder of Austin Police Officer Ralph Ablanedo. He requests a certificate of appealability ("COA") authorizing him to appeal the district court's denial of federal habeas relief. The request for a COA is GRANTED.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

I.

Powell was valedictorian and "most likely to succeed" in his high school class. After graduating from high school a year early, he was accepted into the Plan II Honors Program at the University of Texas. While there, he became an anti-war protester and began using drugs. He never finished college. By 1978, when he was 28 years old, he had become a heavy user of methamphetamine and was also selling it. He was wanted by the police for misdemeanor theft and for passing over 100 bad checks to merchants in the Austin area. He had become so paranoid that he had begun carrying around loaded weapons, including a .45 caliber pistol, an AK-47, and a hand grenade.

On May 17, 1978, Powell asked his former girlfriend, Sheila Meinert, to drive him from Austin to Killeen, Texas. They went in Powell's car, a red Mustang. Powell had the .45, the AK-47, and the hand grenade with him, as well as a backpack containing about 2 1/4 ounces of methamphetamine.

Officer Ablanedo was on duty in his marked patrol car when he spotted the Mustang and noticed that it did not have a rear license tag. He pulled the vehicle over. Meinert got out of the car and approached Ablanedo. She told him that she had lost her driver's license, but showed him her passport. Ablanedo also checked Powell's driver's license and asked the dispatcher to run a warrant check on Meinert and Powell. The dispatcher informed Ablanedo that the computers were not functioning properly, but that there were no local warrants for Meinert. Ablanedo gave Meinert a ticket for failing to display a driver's license and allowed her and Powell to leave. Moments later, the dispatcher told Ablanedo that Powell had a "possible wanted" for misdemeanor theft. Ablanedo signaled for Meinert to pull over again. Meinert testified that she got out of the car and as she was approaching the officer, she heard a very loud noise and ran back to the car. As Ablanedo approached the Mustang, Powell shot him with the AK-47, in semi-automatic mode, through the car's back window, knocking

2

Ablanedo to the ground. As Ablanedo tried to get up, Powell fired at him again, after switching the AK-47 to automatic mode.

Bobby Bullard, who happened to be driving by on his way home from work, witnessed the shooting of Ablanedo. He testified at trial that he saw shots fired from the Mustang that knocked out the back windshield. He saw a man sitting in the middle of the front seat, lying on top of the console, sort of into the back seat. He said that the man who fired the shots had long hair and was wearing a white t-shirt, and at trial he identified Powell as the man he saw that night. Edward Segura, who lived in the area, heard what he thought sounded like machine gun fire. When he went outside, he saw a red Mustang driving away. Segura testified that Ablanedo said that he had been shot. When Segura asked, "who was it," Ablanedo replied, "a girl."

When the dispatcher learned that there was a possible warrant for Powell, as a matter of routine, she sent Officer Bruce Mills to assist Ablanedo. When Mills arrived at the scene a few minutes later, he found Officer Ablanedo lying on the ground. Although Ablanedo wore a bullet-proof vest, it was not designed to withstand automatic weapon fire. Ablanedo suffered ten gunshot wounds and died on the operating table at the hospital, about an hour after he was shot.

Bullard, his wife Velma, who came outside after seeing the lights from the police car, Segura, and Officer Mills all attempted to aid Ablanedo while waiting for the ambulance to arrive. All of them testified that Ablanedo said, repeatedly, "that damn girl" or "that Goddamn girl."[1] Mills testified that Ablanedo told him that a girl and a guy were in the car, and that they were armed with a shotgun or machine gun. Mills said that Ablanedo told him, twice, that "He got me with the shotgun."

---

[1] Dr. John Blewett, an emergency room physician, and Austin Police Officer Roger Napier, testified that they, too, heard Ablanedo say "that damn girl" when he was in the emergency room prior to his death.

3

Apparently one of the shots fired by Powell flattened one of the Mustang's rear tires. Meinert drove the car into the parking lot of a nearby apartment complex. Officer Villegas, who was en route to the scene and who had heard a description of the Mustang in the dispatcher's broadcast, spotted the vehicle in the apartment complex parking lot and pulled in. He immediately came under automatic weapon fire. He testified that a male with medium length hair and no shirt was firing at him. More police officers arrived, and a shoot-out ensued. Miraculously, no one was shot.

Sheila Meinert testified that Powell handed her a hand grenade in the apartment complex parking lot and told her to remove the tape from it. She said that she started peeling tape off the grenade, but was hysterical and shoved it back at him and she did not know what he did with it.

Officer Bruce Boardman testified that the shooting in the apartment complex parking lot came from a person at the passenger side of the Mustang. He said that he saw that person appear again, making "a throwing motion" over the top of the Mustang, and simultaneously, a female at the driver's side of the Mustang ran away from the car, screaming hysterically and flailing her arms. The person at the passenger's side (Powell), after making the "throwing motion," began running away from the scene toward the grounds of a high school across the street.

Later, officers found a live hand grenade about ten feet away from the driver's door of Officer Villegas's car that was parked in the same parking lot. The pin for the grenade was discovered outside the passenger side of the Mustang where the person making the throwing motion had been. The grenade, which had a kill radius of 16 feet and a casualty radius of 49 feet, did not explode because the safety clip had not been removed. The State presented evidence that it was likely that only someone who had been in the Army (Powell had not) would have been familiar with the concept of a safety clip (also known as a

4

jungle clip), which was added to the design during the Vietnam War to keep grenades from exploding accidentally if the pin got caught on a branch.

Meinert was arrested in the apartment complex parking lot. She was later convicted as a party to the attempted capital murder of Officer Villegas. Powell was arrested a few hours later, around 4:00 a.m. on May 18, after he was found hiding behind some shrubbery on the grounds of the high school. Powell's .45 caliber pistol was found on the ground near where he was hiding, and his backpack containing methamphetamine with a street value of approximately $5,000 was found hanging in a tree.

Law enforcement officers searched the Mustang and recovered handcuffs, a book entitled "The Book of Rifles", handwritten notes about weapons, cartridge casings, the AK-47, a shoulder holster, and a gun case. Following a search of Powell's residence, officers seized another hand grenade, methamphetamine, ammunition, chemicals and laboratory equipment for the manufacture of methamphetamine, and military manuals.

In September 1978, Powell was convicted and sentenced to death for the capital murder of Officer Ablanedo. His conviction and sentence were affirmed on direct appeal. Powell v. State, 742 S.W.2d 353 (Tex. Crim. App. 1987). The Supreme Court vacated and remanded for reconsideration in the light of Satterwhite v. Texas, 486 U.S. 249 (1988). Powell v. Texas, 487 U.S. 1230 (1988). On remand, the Texas Court of Criminal Appeals reaffirmed Powell's conviction and sentence. Powell v. State, 767 S.W.2d 799 (Tex. Crim. App. 1989). The Supreme Court vacated Powell's sentence. Powell v. Texas, 492 U.S. 680 (1989).

Powell was convicted and sentenced to death again following his second trial in November 1991. Although the Supreme Court had vacated only the sentence, Texas law at that time required a retrial of the entire case even if the reversal was only for sentencing error. On direct appeal, the Texas Court of Criminal Appeals affirmed the conviction, but vacated the sentence and

remanded for a new sentencing trial, because the trial court had not instructed the jury to answer the special issue on deliberateness. Powell v. State, 897 S.W.2d 307 (Tex. Crim. App. 1994). By that time, Texas law had changed and no longer required a retrial of the entire case when reversal was only for sentencing error.

Powell filed a petition for a writ of certiorari, claiming that he was entitled to a complete new trial, and not just a new trial on punishment. The trial court stayed the proceedings until the Supreme Court denied certiorari. Powell v. Texas, 516 U.S. 808 (1995).

Powell then filed a motion in the trial court to set aside his conviction and for a complete new trial on guilt or innocence as well as punishment. The trial court denied that motion on May 21, 1996.

Before Powell's third trial began, the defense tried to establish that Meinert was involved in the shooting of Ablanedo and in the exchange of gunfire with officers in the apartment complex parking lot. In pursuit of that theory, they retained a metallurgist to conduct chemical analysis of the bullet fragments recovered from Ablanedo's body after exhumation and a second autopsy in 1998. They also subpoenaed Meinert's parole records.

The testing by the defense expert was incomplete at the time the third trial commenced in February 1999. After they were denied a continuance, defense counsel made a strategic decision not to present any evidence of their "two-shooter" theory. Instead, Powell's counsel told the jury in his opening statement that Powell was responsible for every aspect of the crime, that Meinert had no part in it, and that, therefore, he would not ask the State's witnesses "a single question" about the circumstances of the crime because "there's not going to be a question about how it was done." The defense theory was that Powell was no longer a future danger. In order to preclude the

prosecution from introducing victim impact evidence, Powell waived his right to offer mitigation evidence.

Meinert's parole records were delivered to the trial judge on March 1, the sixth day of the State's case and the day before Meinert testified. The trial court, after in camera examination, released the records to defense counsel. Meinert's parole file included the following documents:

(1) A seven-page document on TDCJ letterhead containing an "official version" of the offense.

(2) A document entitled "Statement of Fact Form," executed by Assistant District Attorney Rosemary Lehmberg. It and the "official version" of the offense stated that Officer Ablanedo was shot several times, fell to the ground, and tried to get up, "but as he did, they shot him again, killing him," and that as soon as Officer Villegas approached the red Mustang in the apartment complex parking lot, "they began firing at him and other officers at the scene." (Emphasis added.)

(3) A July 21, 1988 letter written by Austin Police Association president Dell Shaw, accusing Meinert of throwing a hand grenade at Officer Villegas, along with 25 pages of signatures of police officers and others.

(4) A May 27, 1987 letter authored by then Assistant District Attorney Terry Keel, requesting that the Board deny parole to Meinert, with an attached letter authored by Arlene Ablanedo-McNeill, the victim's sister, accusing Meinert of throwing a hand grenade at Officer Villegas, accompanied by ten pages of signatures of police officers and law enforcement personnel.

(5) A September 22, 1988 letter written by Arlene Ablanedo-McNeill, protesting Meinert's parole and stating that Meinert threw a hand grenade at Officer Villegas, accompanied by 17 pages of signatures of police officers and others.

The persons who signed the letters to the parole board accusing Meinert of throwing the hand grenade include: (1) Officer Bruce Boardman, who was the

only witness who testified at Powell's trial that Powell threw the grenade; (2) Terry Keel, the lead prosecutor at Powell's second trial; (3) Robert Smith, the lead prosecutor at Powell's third trial; (4) Officers Justin Shaffer and Lupe Trevino, who testified about Powell's arrest; (5) Officer Napier, who testified about Meinert's statement to the police; (6) Bruce Mills, who testified about Ablanedo's dying declaration; and (7) six officers who testified about various aspects of the investigation.

Powell moved for a continuance in order to attempt to interview the persons who signed the letters, but the trial judge denied it. Counsel made no attempt to use Meinert's parole records in an attempt to establish that Meinert played a role in the shooting or the throwing of the grenade.[2]

As proof of future dangerousness, the State relied primarily on the facts of the murder and the shoot-out at the apartment complex parking lot, including the throwing of the hand grenade. In addition, the State presented evidence that in 1970, Powell stole a car and used false identification, and that, in early 1978, he followed a maintenance worker home with a knife after the worker prevented him from breaking into a storage building where his landlord had stored his property after he failed to pay his rent. The State also presented evidence of incidents occurring during Powell's incarceration following Ablanedo's murder. In October 1978 he was displeased with the television program being shown in the prison and spat on a corrections officer. In February 1979, he spat at an employee at Rusk State Hospital after the employee told him he would have to get up at 6:00 a.m. to use a razor. In April

---

[2] In a formal bill of exception filed in the trial court in March 1999, Powell stated that the court instructed counsel not to use Meinert's parole records to cross-examine her. The record does not support that statement. In denying the defense request for an adjournment, the trial court stated that the parole file documents were inadmissible hearsay. Just before Meinert testified, defense counsel told the court that the defense was not going to use the documents from Meinert's parole file, because the defense received the material too late to develop the two-shooter theory.

1979, he beat on a door with a chair because he was angry after security would not let him have some food that a visitor had brought to him, and he told a security technician at Rusk State Hospital that he could make $2000 by arranging an escape. In May 1979, he kicked a guard in the courtroom when the guard restrained him while he was trying to hug or kiss his girlfriend. In 1988, he received a disciplinary report for having an extra pair of socks and shorts. In 1989, he received a disciplinary report for playing his radio too loud. In 1990, he received a disciplinary report for not making his bed before 6:00 a.m. Also in 1990, he kicked and banged on a door when he was not allowed to use the telephone to call his attorney. During jury selection for his 1991 trial, he became angry and cursed a guard when he was not allowed to have contact lens wetting solution for his sore eyes. In 1992, he put his foot in front of the door to the day room when a corrections officer was trying to close the door. Finally, in 1996, he received a disciplinary report for refusing to obey an order to remove a poster from the wall of his cell.

Powell's counsel presented evidence that Powell had been a smart, well-mannered, courteous, law-abiding young man with great promise. He grew up on a dairy farm and attended a rural school. But he was exceptionally bright. He was valedictorian of his very small high school class, and graduated a year early. He entered the honors program at the University of Texas. But his life soon took a decided turn downhill. He began using drugs, which led to his debilitating addiction, drug dealing, thefts, and increasingly irrational behavior. The defense also presented evidence that once he settled down in prison his attitude took a turn much for the better. Powell became a model prisoner and had developed positive relationships with many Texas citizens. His family and friends testified that, once his involvement with drugs ended after he went to prison, Powell was very much like the young man they had known before he became involved with drugs -- pleasant, sociable, friendly, and helpful to others.

9

Several prison guards testified for the defense that Powell was quiet, well-mannered, and not a troublemaker in prison. There was evidence that he had helped other inmates learn to read, and that he was involved with other citizens in various forms of volunteer work. He was also admitted to the work-capable program, and had a job in the prison garment factory, where he had access to scissors and other sharp instruments. The assistant plant manager testified that Powell was a good worker in the garment factory.

Thus, nearly all of the evidence of future dangerousness related to the events before Powell went to prison. Furthermore, in closing argument, prosecutor Darla Davis referred to Dr. Wallace's testimony when arguing that Powell was not under the influence of drugs at the time of the murder and shoot-out. In his final closing argument, prosecutor Robert Smith argued that Powell's future dangerousness was evident from the fact that he was in full control, and not crazed on drugs, when he shot Ablanedo and threw the hand grenade:

> You want to pretend to me that David Lee Powell knew there was tape on that grenade when he threw it? He's hunkered down in the Mustang in a fire fight for his life. He gave it to Sheila and told her what to do. You see the photograph, it's ten feet from Villegas' patrol car. You think he wasn't trying to kill people?

The jury answered the special issues on deliberateness and future dangerousness affirmatively and the trial court sentenced Powell to death.

Powell filed a motion for new trial in which he argued, among other things, that his due process rights were violated by the untimely disclosure of the exculpatory evidence in Meinert's parole file. In response, the state presented affidavits from Lehmberg, Shaw, and others who signed the protest letters, in which they stated that they had no personal knowledge regarding whether Meinert fired any shots at either scene or threw the hand grenade. The trial court denied Powell's motion for a new trial.

The Court of Criminal Appeals affirmed Powell's sentence. Powell v. State, No. 71,399 (Tex. Crim. App. 2002) (unpublished). The Supreme Court denied certiorari. Powell v. Texas, 537 U.S. 1015 (2002).

Powell filed an application for state habeas relief in September 2001. The Texas Court of Criminal Appeals denied relief in September 2002. Ex parte Powell, No. 7,407-02 (Tex. Crim. App. Sept. 25, 2002) (unpublished order).

Powell filed a petition for federal habeas relief on October 30, 2003. The district court adopted the magistrate judge's report and recommendation and denied relief on December 27, 2005. The district court also denied a COA.

II.

Powell requests a COA from this court authorizing him to appeal the district court's denial of habeas relief for three claims:

Claim 1. Apprendi v. New Jersey, 530 U.S. 466 (2000), and Ring v. Arizona, 536 U.S. 564 (2002), which were decided while Powell's case was on direct appeal, required that Powell's third trial (a capital resentencing proceeding following affirmance of the conviction) be a complete new trial on all the elements of the capital offense (including guilt-innocence elements) rather than just a retrial on the elements formerly treated as sentencing factors.

Claim 2. The prosecution's failure timely to disclose documents in which agents of the prosecution asserted that Meinert fired shots at Officer Ablanedo and the other officers and threw a hand grenade violated Powell's right to due process under Brady v. Maryland, 387 U.S. 83 (1963).

Claim 3. Powell's Fifth and Fourteenth Amendment rights under Estelle v. Smith, 451 U.S. 454 (1981), were violated when an emergency room doctor, who did not provide Miranda warnings to Powell when he examined Powell following his arrest, testified for the prosecution about Powell's answers to questions the doctor asked during the examination.

To obtain a COA, Powell must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(1)(A). To make such a showing, he must demonstrate that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 327 (2003). In making our decision whether to grant a COA, we conduct a "threshold inquiry," which consists of "an overview of the claims in the habeas petition and a general assessment of their merits." Id. at 327, 336. "While the nature of a capital case is not of itself sufficient to warrant the issuance of a COA, in a death penalty case any doubts as to whether a COA should issue must be resolved in the petitioner's favor." Ramirez v. Dretke, 398 F.3d 691, 694 (5th Cir. 2005) (internal quotation marks and citations omitted).

Based on our limited, threshold inquiry and general assessment of the merits of Powell's claims, we conclude that those claims present issues that are adequate to deserve encouragement to proceed further. We therefore GRANT a COA authorizing Powell to appeal the district court's denial of habeas relief for each of the three claims that Powell has presented. We think that these issues have been well briefed. If, however, Powell wishes to file a supplemental brief with respect to the merits of this claim, he may do so within thirty days of the date of this order. The supplemental brief should address only matters, if any, that have not already been covered in the brief in support of the COA application. If Powell files a supplemental brief, the State may file a response fifteen days thereafter.

### III.

For the foregoing reasons, Powell's request for a COA is GRANTED.