# COURT OF APPEALS, DIVISION III, STATE OF WASHINGTON

| | | |
|---|---|---|
| In re the Matter of the Personal Restraint of | ) ) ) | No. 32633-1-III |
| | ) ) ) | **ORDER WITHDRAWING OPINION** |
| JOSE LUIS SANCHEZ, Jr. | ) ) | |

The court on its own motion finds that the opinion filed January 24, 2017, should be withdrawn;

THEREFORE, IT IS ORDERED that the opinion filed January 24, 2017, is hereby withdrawn and a new opinion shall be filed this day.

FOR THE COURT:

_____
GEORGE FEARING
CHIEF JUDGE

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In re the Matter of the Personal Restraint of | ) ) ) ) ) ) | No. 32633-1-III |
| | | PUBLISHED OPINION |
| JOSE LUIS SANCHEZ, JR. | ) | |

LAWRENCE-BERREY, J. — Jose Luis Sanchez, Jr., seeks relief from personal

restraint imposed for his 2008 Yakima County convictions of two counts of aggravated

first degree murder and other felony crimes. The convictions stem from his participation

in a February 20, 2005 home invasion robbery and execution-style shootings at the

apartment of Ricky Causor and Michelle Kublic. The shootings killed Causor and the

couple's 3-year-old daughter and wounded Kublic and their 18-month-old daughter. At

trial, Kublic positively identified Sanchez as the shooter, as did Sanchez's codefendant

Mario Mendez who previously pleaded guilty and testified for the State. Sanchez filed a

direct appeal and this court affirmed the judgment and sentence. *State v. Sanchez*, 171

Wn. App. 518, 288 P.3d 351 (2012), *review denied*, 177 Wn.2d 1024 (2013).

In this timely filed personal restraint petition (PRP), Sanchez contends he is entitled to a new trial on grounds that (1) he was denied his right to counsel under the Sixth Amendment to the United States Constitution during a critical stage when he was arraigned without counsel, and (2) in the alternative, his counsel provided ineffective assistance by failing to appear and object to his being filmed by media at his arraignment proceeding. We disagree with his contentions and dismiss his PRP.

## FACTS

Police arrested Sanchez on February 23, 2005, after acting on anonymous telephone tips that he was responsible for the Causor murders. The next day, he appeared for a single court hearing on two matters: (1) arraignment on an outstanding 2004 matter charging him with certain felonies, and (2) a preliminary appearance in the current murder case. The prosecutor was present but no attorney appeared for Sanchez. First addressing the 2004 matter, the court advised Sanchez of his rights, which he acknowledged he understood before requesting that the court appoint counsel. The prosecutor interjected that an attorney had already been appointed on the 2004 matter, but that Yakima County public defender/director of assigned counsel, Daniel Fessler, was requesting that the court appoint him on both matters. The court did so. The court then explained to Sanchez that he was being held under investigation on suspicion for first

2

degree murder, attempted first degree murder, first degree robbery, and felon in possession of a firearm. Based on a police probable cause declaration showing that acquaintances of Sanchez had implicated him in the robbery and murders, the court found probable cause to believe Sanchez committed one or more crimes. The probable cause declaration also stated that "victim Michelle Kublic was shown a photo montage, which included 'Gato's' photo, whose name is Mario Mendez. She positively identified him as one of the males who entered her house and shot them." Pers. Restraint Pet., App. C, Decl. of Probable Cause at 6. The court set Sanchez's bail at $5 million and scheduled his arraignment for February 28.

On February 28, 2005, the State formally charged Sanchez and Mendez (who still remained at large) with seven crimes including two counts of aggravated first degree murder, which carried a possible death penalty. That day, Sanchez and an unknown number of other defendants appeared in superior court for a group arraignment hearing. The court explained their rights and noted that each "has a lawyer appointed to represent you or you might have hired a private attorney." Pers. Restraint Pet., App. B, Report of Proceedings (RP) (Feb. 28, 2005) at 2-3. The court then explained the process for the arraignment hearing:

3

[W]hen your name is called we'll ask you to step up to the counter in front of this microphone. The prosecutor will hand you a piece of paper called an information. That lists the charges. She will read that to you if you want her to read it out loud. You don't have to have it read out loud.

After that, I'm going to ask you a couple of questions. I'm going to ask you if you understand the charges and if you have any questions about the rights I have just explained.

If you don't have questions, I am going to hand you an order. On the order there is the next two dates that you need to be in court. One is for an omnibus hearing. The next is for your trial.

. . . .

Many of you have not had a chance to talk to your lawyer yet, if it's appointed counsel. You're [sic] lawyer is going to get a packet of information from the prosecutor's office in the next couple of days. They will schedule a time to come and meet with you.

At the end of all this I'm going to hand you that order and ask you to sign the order at the bottom of the page. By signing the order you're not admitting that you have done anything wrong. It lets us know that you have gotten a copy of the paperwork today.

Pers. Restraint Pet., App. B, RP (Feb. 28, 2005) at 3-4.

The court then called Sanchez's case. The court's prior explanation of rights to the defendants included the right to counsel, but did not specify any right to have counsel present during the current hearing. No attorney appeared for Sanchez. The prosecutor recited the seven charges and gave Sanchez a copy of the information. Sanchez acknowledged to the court that he understood the charges, and he declined a full reading of the information. He said he had no questions about the rights previously explained to

4

him. The court entered an order setting dates for the omnibus hearing and trial. Sanchez signed the order and received a copy.

No one broached the subject of entering a plea during the arraignment. The court apparently entered summary not guilty pleas for Sanchez. No concerns regarding the arraignment procedure were ever voiced during the remainder of the pretrial and trial proceedings.

The case was high profile in the community and had already generated considerable media coverage. In his declaration filed with this petition, Sanchez states he appeared at the arraignment without counsel and in jail clothes and shackles. He states "there were lots of news media people and cameras," and he "observed people photographing my face and filming the proceedings when I was in court that day." Pers. Restraint Pet., App. D at 2. He states he did not want to be filmed but did not know there was any way to prevent this from happening. The report of proceedings for the arraignment hearing is silent as to the presence of media.

Meanwhile, Michelle Kublic had remained hospitalized for multiple gunshot wounds until she was released to her father's home on February 26. The following facts quoted from the direct appeal opinion detail Kublic's various initial descriptions of the perpetrators while in the hospital and shortly after her hospital release:

5

Officer David Cortez of the Yakima Police Department attempted to interview Kublic in the hospital intensive care unit the . . . morning [after the shooting]. She was medicated, was in obvious pain, appeared tired, and was slow to give answers. She told him the attackers were two Mexican men whom she believed arrived in an older, full-size, light-blue pickup truck that she noticed when walking out to her car the prior evening. Although Kublic would later describe the two gunmen and their roles differently, Officer Cortez's notes indicate that she told him the first had a wide nose and a lighter complexion and bigger build than the second, and that he wore a mask. She said the second gunman did not wear a mask; had a "sucked in" face; was thinner than the first; was small (she estimated about 5 feet 4 inches or 5 feet 5 inches tall); and was dingy looking with uncombed, matted hair. . . . She said the second had forced her from her vehicle and made her walk back to her apartment with a semiautomatic pistol to her head. He was the one who later shot Causor. She said Causor had taken the first gunman to another part of the apartment to give him what he wanted while she and the children stayed with the second.

The next morning, February 22, Detective David Kellett, the lead investigator for the department, visited Kublic in the hospital, hoping with her assistance to create composite images of the gunmen. Kublic looked sleepy and under the influence of medication, but was able to participate for about 45 minutes until pain and discomfort made her too tired to continue. In providing descriptions to the detective, Kublic initially did not differentiate between the two gunmen except to state that one wore a mask and one did not. She told the detective she did not get as good a look at the one with the mask but remembered well the face of the person who wore no mask.

Detective Kellett then enlisted her assistance in preparing a computer-generated composite of the gunman she remembered best. Kublic described him as thin and gaunt, with long and unkempt straight hair, a thin or short mustache, and a dark Hispanic complexion. Detective Kellett never asked her whether he, or the other, was the shooter. When she reached a point at which she was in too much pain to continue, she told him that the depiction was good so far but that the cheeks needed to be more hollow, the chin different, and the hair longer.

6

On the night of February 22, Officer Cortez returned to the hospital and showed Kublic a photomontage. Before allowing Kublic to view this and later photo arrays, he admonished her that she was not required or expected to choose anyone but just to pick the person who did the crime, and that the purpose of the review is not only to arrest offenders but to clear the innocent. The photo array presented by Cortez happened to include Jose Luis Sanchez Jr., but only as a filler photo because he was not yet a suspect. Kublic did not identify him or anyone else from the array.

. . . .

Detective Kellett returned to the hospital again late on the night of February 23 to present Kublic with a binder including a 20-page serial array of individual photographs. Among them were photographs of Junior Sanchez, Mario Mendez, and Manuel Sanchez. The detective did not tell her that Junior Sanchez had been arrested. Kublic appeared more alert. Detective Kellett positioned himself beside her and turned the pages, pausing about three seconds with each page. Upon seeing Mendez's photo, Kublic gasped and said, "[T]hat looks like him." She did not react in any way upon seeing the photographs of Junior Sanchez or Manuel Sanchez. After reviewing all of the photographs, Kublic took the book from the detective's hands, turned back to the photo of Mendez and expressed assurance that he was "the one without the mask."

. . . .

On March 2, several days after Kublic was released from the hospital, she met with Detective Kellett to provide a tape-recorded statement. By that time, Junior's booking photo had appeared in the newspaper and on local television news. In the course of Kublic's recorded statement, she stated that she now thought the suspect she had earlier described as having very short hair might have been the one with the automatic gun. She also stated that she had thought he had hair, "but after I saw him on the news, he's the one with the shaved head, the one that they have." Detective Kellett's understanding was that Kublic had been sure on February 23 that Mendez was the one without the mask, but on March 2 was now sure that "the one that they have" (Junior) was the one without the mask.

*Sanchez*, 171 Wn. App. at 528-32 (citation omitted).

7

In August 2007, Sanchez moved to suppress Kublic's eyewitness identification of him as induced by impermissibly suggestive police procedures likely to lead to misidentification. He argued that her identification was too unreliable to be submitted to the jury.

At the suppression hearing, the officers testified to the above facts. Kublic testified that during her entire time in the hospital, she needed pain medication and wanted to sleep. She said her initial confusion about whether the shooter had been the man with or without the mask passed as she recovered from the trauma of the shooting and that it became clear in her own mind (without input from police or anyone else) that the shooter was the man with the shorter hair. She had seen him clearly just before he pulled the trigger and was 100 percent sure it was Sanchez. Kublic also testified that sometime after her hospital release, she saw a newspaper photo clipping of Sanchez near the cash register in a convenience store. On April 12, 2005, she attended a court hearing in which she viewed Sanchez in the courtroom in jail clothes and handcuffs. When asked about telling Detective Kellett in the March 2 interview that she saw Sanchez on the news, she answered that she could not remember. She did not recall previously seeing him on television or in the newspaper.

8

Dr. Robert Shomer, the defense eyewitness identification expert, testified at the hearing and opined that the combination of Kublic viewing Sanchez in a 6-pack photo array on February 22, then in the 20-photo serial array, then in a newspaper clipping, and also in the news media, created a source confusion that led her to mistakenly believe someone pictured in the montages was familiar from the crime scene. He opined this irrevocably tainted Kublic's memory of the primary suspect and irreparably undermined the validity of her identification such that it lacked independent reliability and rendered any in-court identification unreliable.

The trial court denied the suppression motion on the basis the police employed no impermissibly suggestive identification procedures. It further noted that Kublic's in-court identification would appropriately be tested on cross-examination and its reliability would be a matter for the jury to decide. The court did comment that by the time of Kublic's March 2 interview with Detective Kellett, she must have either seen an account of the Sanchez arrest on the news or been told about it by someone in her family or elsewhere. This court upheld the trial court's ruling on direct appeal. *See Sanchez*, 171 Wn. App. at 581-83.

At trial, Michelle Kublic testified to the details of the shooting incident and her certain identification of Sanchez as the shooter. She left her apartment to run an errand

9

on the night of February 20, 2005. While backing her vehicle from its parking spot, she was confronted by a Hispanic man with a gun, who appeared in front of the vehicle, illuminated by her headlights. A second Hispanic man opened the driver's door, grabbed her by the hair, and pulled her from her vehicle. The second man held a gun to her head and walked her back to the apartment where she and Ricky Causor, a drug dealer, lived with their two daughters. Causor opened the door and the man holding Kublic hostage pointed his gun at Causor. Kublic noticed the gun was square-shaped with its ammunition clip inserted from the bottom. Causor let the gunman enter. Once inside, the gunman forced Kublic to kneel on the floor with her daughters.

The man Kublic had first seen in her headlights (Mendez) soon entered the apartment, now wearing a mask. He carried a revolver-style handgun and guarded her in the living room while the unmasked intruder took Causor into the kitchen to retrieve marijuana and approximately $900 in currency. The unmasked intruder escorted Causor back to the living room. Causor then knelt down facing Kublic, with their daughters on the floor between them. Kublic testified that at that point, she saw that the unmasked intruder had a really mad look on his face. He walked directly behind Causor and fired five shots from his .45 caliber handgun at the heads of Causor and Kublic. Kublic said it was at that moment she saw the shooter the best. She identified him in court as the

10

defendant, Jose Luis Sanchez, Jr. She testified she was 100 percent certain it was him. She testified she saw his face "clear as day, mad and pointing the gun." RP (Nov. 15, 2007) at 1037. She said he never wore a mask and that he shot with the same square-shaped gun he had earlier pointed at Causor in the apartment doorway. She said she had not gotten any information about the suspects from other individuals or news media sources.

As contemplated in the court's ruling denying suppression of Kublic's eyewitness identification, the defense extensively cross-examined her about the differences in her descriptions of the assailants at various times, including while she was in the hospital. She maintained that despite any variations of what she told detectives, her first good look at either assailant was the person in front of her vehicle who was then not wearing a mask but later wore one. But in the end, she got the best look at the person who never wore a mask, and it was that person (Sanchez) who shot her family. She further said she did not recall seeing Sanchez in the news.

Sanchez presented defenses of alibi (that he was at a girlfriend's apartment at the time of the killings) and misidentification, including Dr. Shomer's expert testimony relating the same source confusion theory as he did at the suppression hearing. The jury accepted the State's witnesses' testimonies that Sanchez was the shooter, rejected

11

Sanchez's theories of alibi and misidentification, and found him guilty as charged.

Additional facts pertaining to the shooting incident are otherwise well known to the parties and will be repeated only as necessary to resolve Sanchez's claims in this PRP.

GROUND ONE—ARRAIGNMENT WITHOUT COUNSEL PRESENT

Generally, to obtain relief in a personal restraint petition the petitioner must show either a constitutional error resulted in actual and substantial prejudice, or a nonconstitutional error caused a fundamental defect resulting in a complete miscarriage of justice. *In re Pers. Restraint of Cook*, 114 Wn.2d 802, 813, 792 P.2d 506 (1990). The supporting evidence must be based on "more than speculation, conjecture, or inadmissible hearsay," and failure to meet this burden calls for dismissal of the petition. *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086 (1992).

Sanchez's primary claim seeks to avoid *Cook*'s requirement that actual and substantial prejudice be shown. He claims his arraignment was a critical stage in the proceedings such that his counsel's absence constitutes structural error requiring automatic reversal of his convictions without considering prejudice. Sanchez relies primarily on *Hamilton v. Alabama*, 368 U.S. 52, 82 S. Ct. 157, 7 L. Ed. 2d 114 (1961) where the United States Supreme Court held that denial of counsel at arraignment—a critical stage under Alabama law—was reversible error without a showing of prejudice.

12

Alternatively, if there was no structural error, Sanchez claims he was nevertheless prejudiced under the *Cook* standard by his attorney's absence at his arraignment.

A.    Claimed Structural Error

"An accused's right to be represented by counsel is a fundamental component of our criminal justice system." *United States v. Cronic*, 466 U.S. 648, 653, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984). Under both the United States and Washington Constitutions, a defendant is entitled to the assistance of counsel at all critical stages of criminal proceedings. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *Missouri v. Frye*, __ U.S.__, 132 S. Ct. 1399, 1405, 182 L. Ed. 2d 379 (2012); *United States v. Wade*, 388 U.S. 218, 224, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967); *State v. Heddrick*, 166 Wn.2d 898, 909-10, 215 P.3d 201 (2009); *State v. Stewart*, 113 Wn.2d 462, 468, 780 P.2d 844 (1989). The United States Supreme Court long ago stated that the period from arraignment to trial is "perhaps the most critical period of the proceedings" during which the accused "requires the guiding hand of counsel." *Powell v. Alabama*, 287 U.S. 45, 57, 69, 53 S. Ct. 55, 77 L. Ed. 158 (1932).

Washington court rules confer on a defendant an early right to counsel. CrR 3.1(b)(1) (right to counsel accrues as soon as feasible after defendant is taken into custody, appears before committing magistrate, or is formally charged, whichever occurs

13

earliest). When an accused appears without counsel at arraignment, the court is required to inform the defendant of the right to counsel before the defendant may be arraigned. CrR 4.1(c). A defendant may proceed forward with the arraignment by waiving the right to counsel, but the waiver must be supported by appropriate findings entered into the record. CrR 4.1(d).

The Washington Supreme Court has recognized that "[a] complete denial of counsel at a critical stage of the proceedings is presumptively prejudicial and calls for automatic reversal." *Heddrick*, 166 Wn.2d at 910 (citing *Cronic*, 466 U.S. at 658-59, 659 n.25; *Bell v. Cone*, 535 U.S. 685, 696 n.3, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002) (denial of counsel at critical stage is structural error and grounds for reversal without a demonstration of prejudice)). "A critical stage is one 'in which a defendant's rights may be lost, defenses waived, privileges claimed or waived, or in which the outcome of the case is otherwise substantially affected.'" *Id.* (quoting *State v. Agtuca*, 12 Wn. App. 402, 404, 529 P.2d 1159 (1974)).

An error is considered "structural" when it "affect[s] the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991). When there is structural error "'a criminal trial cannot reliably serve its function as a vehicle for

14

determination of guilt or innocence, and no criminal punishment may be regarded as

fundamentally fair.'" *Id.* (quoting *Rose v. Clark*, 478 U.S. 570, 577-78, 106 S. Ct. 3101,

92 L. Ed. 2d 460 (1986)). For this reason, structural errors are not subject to harmless

error analysis. *Id.* at 309-10; *see In re Pers. Restraint of Stockwell*, 179 Wn.2d 588, 608,

316 P.3d 1007 (2014) (McCloud, J., concurring).

But United States Supreme Court jurisprudence establishes that constitutional

harmless error analysis applies to the denial of the Sixth Amendment right to counsel at

all stages of criminal proceedings, except for those where "the deprivation of the right to

counsel affected—and contaminated—the entire criminal proceeding." *Satterwhite v.*

*Texas*, 486 U.S. 249, 257, 108 S. Ct. 1792, 100 L. Ed. 2d 284 (1988). In *Satterwhite*, the

court held that conducting psychiatric examinations in violation of the Sixth Amendment

did not "pervade the entire proceeding" and was subject to harmless error analysis. *Id.* at

256. Likewise, in *Fulminante*, the admission of a confession obtained in violation of the

Sixth Amendment was subject to harmless error analysis. *Fulminante*, 499 U.S. at 310-

11.

The United States Supreme Court has repeatedly referenced the arraignment case,

*Hamilton*, 368 U.S. 52, and the preliminary appearance case, *White v. Maryland*, 373 U.S.

59, 83 S. Ct. 1050, 10 L. Ed. 2d 193 (1963) as examples of deprivation of counsel that

"by their very nature cast so much doubt on the fairness of the trial process that, as a matter of law, they can never be considered harmless." *Satterwhite*, 486 U.S. at 256; *see also Wade*, 388 U.S. at 225 (observing *Hamilton* as an example of *Powell*'s "guiding hand of counsel" principle because it involved the "type of arraignment" where certain rights might be sacrificed or irretrievably lost if not asserted); *see also Bell*, 535 U.S. at 695-96 (observing *Hamilton* and *White* as examples of a trial being presumptively unfair due to denial of presence of counsel at a critical stage, "such as arraignment, that held significant consequences for the accused").

In *Hamilton*, the United States Supreme Court determined that an arraignment in a capital case under Alabama law was a critical stage because it was the point in the proceedings at which a defendant must (by statute) assert the defense of insanity or the defense was deemed waived, only recoverable on discretion of a trial judge whose decision was not revisable on appeal. *Hamilton*, 368 U.S. at 53. In addition, Alabama law required pleas in abatement, motions to quash based on systematic exclusion of one race from grand juries, or claims that the grand jury was otherwise improperly drawn to be made at the time of arraignment. *Id.* at 53-54. The Court concluded that "[w]hatever may be the function and importance of arraignment in other jurisdictions . . . in Alabama it is a critical stage in a criminal proceeding. What happens there may affect the whole

16

trial. Available defenses may be . . . irretrievably lost, if not then and there asserted." *Id.* at 54. The Court thus held that denial of counsel to Hamilton at arraignment was reversible error without considering prejudice. *Id.* at 54-55.

Similarly, in *White* the defendant appeared without counsel at a preliminary hearing and entered a guilty plea. *White*, 373 U.S. at 59. Although White later withdrew the plea, it was used against him at trial. *Id.* at 60. Referencing *Hamilton*, the Supreme Court determined that the preliminary hearing was "as 'critical' a stage as arraignment under Alabama law" because White entered a plea that was taken by the magistrate at a time when he had no counsel. *White*, 373 U.S. at 60. In finding *Hamilton* controlling and reversing the judgment without considering prejudice, the court reasoned that "'[o]nly the presence of counsel could have enabled this accused to know all the defenses available to him and to plead intelligently.'" *White*, 373 U.S. at 60 (quoting *Hamilton*, 368 U.S. at 55).[1]

---

[1] For other examples of cases of presumed prejudice when counsel was absent or prevented from assisting the defendant at a critical stage, *see e.g.*, *Penson v. Ohio*, 488 U.S. 75, 88-89, 109 S. Ct. 346, 102 L. Ed. 2d 300 (1988) (complete denial of counsel on appeal); *Holloway v. Arkansas*, 435 U.S. 475, 98 S. Ct. 1173, 55 L. Ed. 2d 426 (1978) (conflict of interest in representation throughout entire proceeding); *Geders v. United States*, 425 U.S. 80, 96 S. Ct. 1330, 47 L. Ed. 2d 592 (1976) (denial of access to counsel during overnight recess); *Massiah v. United States*, 377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964) (accused confronted by prosecuting authorities who obtained incriminating statements by ruse and in the absence of defense counsel); *Gideon v.*

17

As illustrated by the above-cited United States Supreme Court cases, the characterization of Sanchez's hearing as an arraignment is not determinative of whether the hearing was a critical stage so that defense counsel's absence was presumptively prejudicial. Rather, we must examine the nature of Sanchez's arraignment before we can determine whether it was a critical stage. Only if the nature of his arraignment was such that he stood to lose important rights that might affect the outcome of his case should it be considered a critical stage. *See Heddrick*, 166 Wn.2d at 910.

Unlike in *Hamilton*, Sanchez stood no risk of waiving any rights or foregoing any defenses at his arraignment. Nor did he make admissions of guilt like the defendant in *White*. He did not forfeit any right to plead guilty or to plead not guilty by reason of insanity. Had he wished to raise an insanity defense, he could have done so "at the time of arraignment or within ten days thereafter or at such later time as the court may for good cause permit." RCW 10.77.030(1). Sanchez never sought to assert an insanity defense or otherwise change his not guilty pleas, even though the information was twice amended prior to trial. Nor does Sanchez assert in his declaration filed with this petition that he ever desired to plead guilty. Instead, throughout the proceedings, he maintained his

*Wainwright*, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963) (total deprivation of counsel throughout entire proceeding); *see also In re Pers. Restraint of Richardson*, 100

defenses of general denial, alibi, and misidentification. Pleading guilty to some charges at arraignment would have been antithetical to Sanchez's defenses to aggravated murder.

The Washington Supreme Court has observed that "[t]he arraignment procedure essentially consists of ascertaining the defendant's name, advising the defendant of certain rights including the right to counsel, and informing the defendant of the charges that have been filed." *State v. Frazier*, 99 Wn.2d 180, 184, 661 P.2d 126 (1983) (citing former CrR 4.1(b)-(e)). In substance, this is all that comprised the limited scope of Sanchez's arraignment proceeding.

Thus, unlike in *Hamilton*, Sanchez makes no showing that any right or defense he possessed prearraignment was forfeited or went unpreserved by his attorney's absence at arraignment. We conclude that any Sixth Amendment or rule-based deprivation/absence of counsel at Sanchez's arraignment did not contaminate the entire trial proceeding so as to bring this case within the purview of *Hamilton*, *White*, or other previously noted cases of presumed prejudice.

Consistent with this conclusion is *State v. Jackson*, 66 Wn.2d 24, 400 P.2d 774 (1965). The *Jackson* court held, the "name of the stage of the criminal proceeding is not controlling" and "[t]he court must look at substance and not merely at form" to ascertain

Wn.2d 669, 679, 675 P.2d 209 (1983) (no independent showing of prejudice required

the possibility of prejudice to the defendant in the defense of his case. *Id.* at 28; *see also State v. Louie*, 68 Wn.2d 304, 308-09, 413 P.2d 7 (1966). As discussed, Sanchez's arraignment proceeding lacked the type of substance so as to confer on it "critical stage" status.

We conclude any infringement on Sanchez's right to counsel at arraignment does not give rise to presumed prejudice or structural error. We thus review his petition under the *Cook* standard requiring him to show actual and substantial prejudice. *See In re Pers. Restraint of Brockie*, 178 Wn.2d 532, 539, 309 P.3d 498 (2013) (if a constitutional error is subject to harmless error analysis on direct appeal, the same error alleged in a PRP must be shown to have caused actual and substantial prejudice in order for the petitioner to obtain relief) (citing *In re Pers. Restraint of Hagler*, 97 Wn.2d 818, 825-26, 650 P.2d 1103 (1982)).

B.    Claimed Prejudice

Sanchez argues he suffered actual and substantial prejudice as a result of his counsel's absence at his arraignment, where counsel could have objected to media filming or photographing his face. We disagree.

---

when error was deprivation of conflict-free counsel).

Sanchez cross-examined Kublic at trial with respect to variations in her descriptions of the intruders and her alleged media exposure. Sanchez also presented his "source confusion" misidentification theory to the jury through Dr. Shomer's expert testimony. The jury credited Kublic's testimony that she was 100 percent certain Sanchez was the shooter because she saw his face clear as day when he fired the gunshots and rejected the defense alibi and misidentification arguments. We do not review the jury's determinations as to weight of the evidence and witness credibility. *State v. Walton*, 64 Wn. App. 410, 415-16, 824 P.2d 533 (1992). Nothing about Fessler's absence at Sanchez's arraignment affected his ability to argue his misidentification defense at trial.

Moreover, Sanchez has never established what media footage or photographs were produced from the arraignment. Sanchez identifies none in the clerk's papers from the appeal and produces none as additional evidence in this petition. Moreover, the question of whether Kublic even saw Sanchez's face in the media is mere speculation. The jury has already credited Kublic's testimony that her identification of him as the shooter did not come from any media but from her own independent observation of his face when he fired the shots.

Finally, Kublic's identification of Sanchez was not the only evidence the State produced linking Sanchez to the crimes. For his part in the Causor home invasion,

21

Mendez pleaded guilty to two counts of first degree murder and other crimes in exchange for a 30-year sentence and truthful testimony at Sanchez's trial. The jury was told of this agreement. Mendez testified as to the details of his and Sanchez's planning and commission of the home invasion robbery. Mendez testified Sanchez shot the victims, and they both fled in Sanchez's truck with Causor's marijuana and money. Consistent with Kublic's trial testimony, Mendez said Sanchez was not wearing a mask when Sanchez shot the victims. Mendez also testified that Sanchez told him prior to the incident that he (Sanchez) would not wear a mask. In addition to Mendez's testimony, police executed a search warrant at Sanchez's residence and recovered a .45 handgun. Ballistics tests confirmed that this handgun was the murder weapon.

Given Kublic's testimony and the strength of the State's other evidence— Mendez's testimony accepted by the jury, and the presence of the murder weapon at Sanchez's residence—Sanchez fails to show he was actually and substantially prejudiced by Fessler's absence at his arraignment. Sanchez fails his burden under *Cook* in his ground one claim.

22

GROUND TWO—INEFFECTIVE ASSISTANCE OF COUNSEL

In the alternative, Sanchez claims he was denied effective assistance of counsel when Fessler failed to appear and object to his being filmed/photographed by media at his arraignment.

To establish ineffective assistance of counsel, Sanchez must show that his attorney's performance was deficient, i.e., that the representation "fell below an objective standard of reasonableness" based on consideration of all the circumstances, and that he was prejudiced by the deficiency. *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Prejudice occurs when but for counsel's deficient performance, it is reasonably likely that the trial outcome would have been different. *McFarland*, 127 Wn.2d at 335. "[I]f a personal restraint petitioner makes a successful ineffective assistance of counsel claim, he has necessarily met his burden to show actual and substantial prejudice." *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 846-47, 280 P.3d 1102 (2012). We need not address both prongs of the ineffective assistance test if the defendant's showing on one prong is insufficient. *Strickland*, 466 U.S. at 697; *State v. Foster*, 140 Wn. App. 266, 273, 166 P.3d 726 (2007).

23

As discussed above, Sanchez is unable to show he was actually and substantially prejudiced by Fessler's absence at his arraignment. He therefore fails to meet *Strickland*'s prejudice prong and fails his burden in his ground two claim.

In conclusion, Sanchez makes no claim entitling him to relief. We, therefore, deny and dismiss his PRP.

Lawrence-Berrey, J.

WE CONCUR:

Fearing, C.J.

Siddoway, J.

24