**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

FILED
7/11/2022
Court of Appeals
Division I
State of Washington

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 83280-8-I |
| Respondent, | |
| v. | DIVISION ONE |
| MITCHELL HENG, | PUBLISHED OPINION |
| Appellant. | |

SMITH, A.C.J. — In January 2017, Mitchell Heng set fire to the Sifton Market, a convenience store located in a commercial building in Vancouver. The fire spread throughout the building and destroyed not only the Sifton Market but also neighboring businesses. The body of Amy Hooser, a Sifton Market employee, was discovered in the rubble.

A jury later convicted Heng of murder in the first degree and arson in the first degree. Heng appeals, arguing that (1) under the rule of lenity, we must assume that the murder conviction was for felony murder predicated on the same arson that was the basis for the arson conviction and (2) the trial court placed Heng in double jeopardy by punishing him for both felony murder predicated on arson and the underlying arson. Because Heng's arson had an effect independent of the murder, we hold that punishing Heng for both crimes did not place him in double jeopardy.

No. 83280-8-I/2

We also hold that Heng's rule-based and constitutional excessive bail challenges are moot, defense counsel's absence from Heng's bail setting does not require reversal, Heng fails to show that counsel was ineffective for not asking the court to revisit bail, and the trial court did not abuse its discretion by admitting a fire marshal's opinion testimony as to the origins of the fire.

Therefore, we affirm.

FACTS

On January 15, 2017, at about 5:35 a.m., firefighters responded to a fire at a commercial building in Vancouver, Washington. The fire started in the Sifton Market, a convenience store in the building, and eventually "burned pretty much the whole building down," destroying not only the Sifton Market but also a barber shop, a pet grooming business, and a pet supply store. Fire crews discovered a person's body in the market's deli area, which was situated in the part of the market farthest away from the main entrance. The body was later identified as Amy Hooser, a Sifton Market employee who had been working the morning of the fire. The Clark County medical examiner concluded that Hooser's cause of death was smoke inhalation and blunt force injuries to the head.

Surveillance videos recovered from the scene showed Hooser in the Sifton Market beginning at about 5:09 a.m.[1] on the morning of the fire, getting the store ready to open. At about 5:11 a.m., Hooser unlocked the front door. About a minute later, a newspaper delivery person entered through the front door,

---

[1] References herein are to "camera time," i.e., the time as shown in the surveillance footage. There was testimony at trial that camera time was "probably fast by about four minutes and thirty seconds."

2

unloaded a stack of newspapers onto a stand inside the store, and then exited the store. At 5:18 a.m., Hooser walked from the cash register area of the store, near the front door, across the sales floor toward the deli area, which itself was not visible on any surveillance footage. Sifton Market's general manager later testified that although there was a camera in the deli area, it was not functioning.

At 5:20 a.m., a man, later identified as Heng, entered the store through the front door. Heng was wearing a baseball cap, dark pants and shoes, and an unbuttoned flannel shirt with a white T-shirt visible underneath. Heng passed Hooser on the sales floor as she walked from the deli area back toward the front of the store.

At about 5:21 a.m., Heng approached Hooser at the front of the store, and Hooser retrieved an item, which Heng later identified as a key to the bathroom, and handed it to Heng. Hooser then walked across the sales floor into the deli area. This was the last time she was visible on any surveillance footage. A short time later, Heng also walked toward the deli area.

After Heng disappeared from the surveillance footage into the deli area, no one was seen on the video for about four minutes. At about 5:26 a.m., Heng emerged from the deli area onto the sales floor, opened and closed two cooler doors, and continued toward the front register area with a soft drink bottle in hand. He walked into the front office, where the footage showed that his white T-shirt now had a visible stain on the front—a stain that Heng later admitted was blood. Heng took a drink from the soft drink bottle and paced around the front office for a moment before taking a carton of cigarettes from the shelf. He then

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

picked up what appeared to be a lighter from the cash register area before walking back across the sales floor into the deli area.

At about 5:30 a.m., Heng reentered the front office holding what appeared to be coffee filters. He opened a cabinet that contained the store's safe, and according to a detective's later testimony, "look[ed] like he[ ] touched the safe and . . . use[d] kind of the coffee filters to touch the safe some more, whether he's trying to access it or wipe it down, I'm not certain." The detective also testified that at this point in the footage from the front office, flickering light could be seen in the bottom right corner, and the video "bec[a]me cloudier until you can't see anything eventually. But, it appears to be smoke filling the room." Heng then picked up a small bin with timecards in it, exited the front office area, and crossed the store again to the deli area. The video cut out a short time later, at around 5:34 a.m. Heng, Hooser, and the newspaper delivery person were the only people visible on the surveillance footage from the morning of the fire.

The State later charged Heng with murder in the first degree, robbery in the first degree, and arson in the first degree. On January 20, 2017, Heng made his preliminary appearance before the trial court. There, Heng confirmed his name and date of birth and requested that counsel be appointed for him. The court then stated,

> All right. We're going to appoint [defense counsel]. We put word out to [defense counsel] trying to get him here this morning, but just not enough time. So, he's not here right now. But he'll be – he's already been notified. So he'll be getting in touch with you very shortly.
>
> I'm gonna now hear recommendations about bail and release. I will allow you to address those, but you do not want to

No. 83280-8-I/5

> talk at all about the alleged incidents that bring you – brings you here today.  And then the next time you're in front of the court with [defense counsel] being present, we'll allow, if you're still in custody, bail to be reviewed with the aid of your attorney.  Do you understand?

Heng confirmed his understanding, and the prosecutor asked the trial court to set bail at $2 million, arguing, "Based on the nature of the charges obviously, this was a violent and premeditated crime, very heinous in nature."  The prosecutor also represented that Heng had prior convictions for assault in the second degree and disorderly conduct, and that Heng's current address could not be verified.  The trial court set bail at $2 million, indicating to Heng, "It can definitely be reviewed.  Your attorney will have a chance to work things up and have an informed discussion with the court at the next court hearing."

Heng, who remained in custody, appeared for his initial arraignment on February 1, 2017.  When the court inquired about the "present bail situation," Heng's counsel responded, "[J]ust to address that.  Counsel was not present when I was appointed to represent Mr. Heng and so bail was set outside the presence of counsel.  At some point in the future I may address it, but I'm not gonna address it now."  The trial court responded, "[I]f you wish to then make sure we do it with some written notice to the State and . . . I'll be willing to hear it."  Counsel did not subsequently ask the court to revisit bail, and Heng remained in custody pending trial.

A jury trial was held over approximately two weeks in September 2019.  Heng testified on his own behalf.  Heng's defense theory was that someone else had killed Hooser, and that Heng had set fire to the Sifton Market under duress.

5

According to Heng, he went to the Sifton Market the morning of the fire to collect money from Hooser, who he claimed sold cocaine for him. Heng testified that when he went into the deli area after using the bathroom, Hooser was there with "Zip," another dealer for whom Hooser sold methamphetamine. Heng testified that when Hooser paid Heng, Zip "got mad that she was giving [Heng] money" because "she obviously was not paying him and she'd owed him a pretty good debt." Heng claimed that Zip then demanded payment from Hooser, grabbed her and hit her several times, and eventually "grabbed [Hooser] by her clothing and hit her against the rack that she was right next to."

According to Heng, Zip threatened Heng that if he "tried to be a hero," Zip would "do the same to [Heng] and [Zip] knew where [Heng] lived." Heng testified that Zip then "just pretty much told [Heng] what to do and [Heng] was scared and . . . didn't want to tell [Zip] no." Heng testified that Zip told him to get him cigarettes, which Heng did after getting himself a drink "to kind of calm [him]self down." Heng testified that after he returned to the deli area and gave Zip the cigarettes and a lighter, Zip then told Heng "to go into the safe and grab whatever and to catch the front on fire." Heng testified that he complied because Zip had threatened him, and Heng was scared that Zip would "do something worse" to Heng and his family. He testified that when he returned to the deli area after starting the fire in the front office, he took the time cards with him to show Zip that nobody else was there. Heng testified that as the fire began to spread, he exited the store through the front door and went back to his apartment a couple of blocks away. He testified that on his way home, he discarded his flannel shirt

6

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

and T-shirt in a neighborhood dumpster and changed into extra clothes he had in his truck. Heng testified that he did not know Zip's real name or where he lived and could not remember what Zip was wearing the morning of the fire. But he described Zip as follows: "He's Caucasian. I think he was mixed with Mexican just because of his color of hair and all his tattoos and stuff[;] probably like 6 feet tall."

While cross examining Heng, the prosecutor played an excerpt from an interrogation detectives conducted with Heng. During the interview, Heng stated that he was told to rob the Sifton Market by a man wearing a black hoodie and standing "[o]n the corner right behind the spa" on the back side of the Sifton Market building. Heng described the man as "black [and] probably 5'10" [and] pretty stocky." Heng said he "looked like a tweaker," so Heng pulled over to ask him if he wanted to buy anything. Heng claimed during the interrogation that the man then threatened to shoot Heng unless Heng robbed the Sifton Market. Heng admitted at trial that this earlier account was not true.

The prosecutor also played excerpts of calls Heng made from jail. In some of those calls, Heng said that the person who "did it" was "a white boy" who Heng thought might have been another Sifton Market employee, who "came in through the roof and . . . came out the roof," had a "wooden paddle," and forced Heng to burn down the store by pointing a gun at his head. In other calls, Heng claimed not to know who killed Hooser. Heng testified at trial that he was lying on those calls. He also admitted to lying during another interrogation when he claimed that the person who was in the deli area with Heng and Hooser was

7

Hooser's boyfriend, Stephen Gephart. Heng further acknowledged lying to detectives in earlier interrogations about what he did with his clothes and shoes and why he went to the Sifton Market in the first place. On redirect, Heng testified that he lied because he was afraid of Zip and because detectives told him they could not protect him and his family.

The surveillance videos were played for the jury during trial. Additionally, the State presented testimony from a number of witnesses, including a detective who testified that although law enforcement did not find the clothes or black shoes they believed Heng was wearing the morning of the fire, they found a pair of Nike brand Air Force One Premium 2007 shoes at Heng's apartment, as well as two boxes in his truck containing Air Force One Premium 2007 shoes in colors other than black. The State presented evidence that the tread marks on this model of shoe matched shoe prints found in the deli area that tested presumptively positive for blood. The State also presented evidence that two stains from the driver's side floor mat of Heng's truck contained DNA[2] mixtures for which "a major component" matched Hooser's DNA profile.[3] And, the State presented evidence that the roof hatch to the Sifton Market was padlocked and wired to the security system, that although the store had an employee entrance and an emergency exit, a person walking from those doors into the deli area would have appeared on the surveillance footage, and while there was also a

_____

[2] Deoxyribonucleic acid.

[3] The State's forensic scientist testified that "[t]he estimated probability of selecting an unrelated individual at random from the US population with a matching profile is . . . one in seventy-seven decillion."

8

window in a back office connected to the deli area, there was a motion sensor that would have triggered an alarm if someone were to enter the store through that window.  The State also presented evidence that although detectives recovered a methamphetamine pipe in Hooser's purse, a search of Hooser's bedroom and car revealed no items of evidentiary value.

Additionally, the State presented testimony from Susan Anderson, a senior deputy fire marshal who investigated the fire.  The prosecutor asked Anderson about, among other things, her "opinion based on [her] training and experience as to how many fires were set and the origin of where they were set." Anderson began by responding that there were multiple areas of the building that experienced the "greatest loss of material," including a shelf in the Sifton Market's front office and "on the victim herself," at which point Heng objected. Heng argued outside the presence of the jury that, if Anderson planned to opine that there was a fire origin on Hooser's body based on the flame damage to and burn patterns near her body, "there has to be some foundation under Frye[4] or Daubert[5] to establish that that conclusion is . . . admissible as evidence." Additionally, after confirming through voir dire that Anderson did not follow the method set forth in National Fire Protection Agency (NFPA) 921[6] when

---

[4] Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).

[5] Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

[6] According to Heng's expert, "NFPA 921 is a guide put out by the National Fire Protection Agency . . . to help investigators perform fire origin and cause investigations," and is "considered kind of the state of the art for fire investigation today."

9

formulating her opinion as to the origins of the fire, defense counsel argued, "[T]here's nothing, there was no testing that was done, there's no sources cited. This is an eyeball analysis without any testing and . . . if she's gonna make that sort of conclusive statement, then . . . I would object."

The prosecutor responded that Heng's objection went to weight and not admissibility, arguing that Anderson could testify based on her training and experience and no Frye hearing was necessary because "she's not gonna say with any scientific certainty that any person set a fire on Ms. Hooser."

The trial court overruled Heng's objection. Anderson then testified "based on the damage to [Hooser's] body and the relative lack of damage in other combustible materials around her body that a fire was probably ignited on her body, clothing or near the body."

During the State's closing, the prosecutor argued, with regard to the charge of murder in the first degree, "There are three ways of committing Murder in the 1st Degree" and "[e]ach of those three ways is charged in this case." First, the prosecutor argued, the evidence supported a finding that Heng caused Hooser's death with the premeditated intent to do so. Second, the prosecutor argued, the evidence supported a finding that Heng committed felony murder by causing Hooser's death in the course of or in furtherance of committed or attempted robbery or arson. And third, the prosecutor argued, the evidence supported a finding that Heng committed murder in the first degree by causing Hooser's death by engaging in conduct that created a grave risk of death under circumstances manifesting extreme indifference to human life.

10

The jury found Heng guilty of murder in the first degree but did not specify the basis for its finding. The jury also found Heng guilty of arson in the first degree. It acquitted Heng of robbery in the first degree.

Multiple individuals, including Hooser's friends and family members, spoke at Heng's sentencing hearing. Sue Picchioni, who owned the pet grooming business that was destroyed in the fire and who had submitted a victim impact statement, also spoke at sentencing. Picchioni expressed that she hoped Heng would "think about . . . all the hurt [his] selfishness has caused," including the loss of the grooming business that she and her family "have been building for over thirty years," the death of family pets that were inside Picchioni's shop at the time of the fire, and the destruction of the businesses on either side of Picchioni's business.

The trial court sentenced Heng to a total term of confinement of 374 months, the high end of the standard range. Heng appeals.

ANALYSIS

Double Jeopardy

Heng argues that, by sentencing him for both arson in the first degree and murder in the first degree, the trial court placed him in double jeopardy by punishing him twice for the same offense. Thus, Heng contends, his conviction for arson in the first degree must be vacated. We disagree.

"The double jeopardy clause of the United States Constitution provides that no person shall 'be subject for the same offence to be twice put in jeopardy of life or limb.' " State v. Muhammad, 194 Wn.2d 577, 615, 451 P.3d 1060

11

(2019) (Gordon McCloud, J., concurring and dissenting) (quoting U.S. CONST. amend. V). "The Washington Constitution similarly provides that '[n]o person shall . . . be twice put in jeopardy for the same offense.' " Id. (alterations in original) (quoting WASH. CONST. art. 1, § 9). "[T]hese two provisions 'provide the same protections.' " Id. at 616 (quoting In re Pers. Restraint of Francis, 170 Wn.2d 517, 522 n.1, 242 P.3d 866 (2010)). Double jeopardy claims may be raised for first time on appeal, and we review them de novo. State v. Mutch, 171 Wn.2d 646, 661-62, 254 P.3d 803 (2011).

The prohibition on double jeopardy protects not only against a second trial for the same offense, but also, as relevant here, " 'against multiple punishments for the same offense.' " Muhammad, 194 Wn.2d at 616 (internal quotation marks omitted) (quoting Whalen v. United States, 445 U.S. 684, 688, 100 S. Ct. 1432, 63 L. Ed. 2d 715 (1980)). In this latter context, " 'the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended.' " Id. (quoting Missouri v. Hunter, 459 U.S. 359, 366, 103 S. Ct. 673, 74 L. Ed. 2d 535 (1983)). Thus, " '[w]here a defendant's act supports charges under two criminal statutes, a court weighing a double jeopardy challenge must determine whether, in light of legislative intent, the charged crimes constitute the same offense.' " State v. Freeman, 153 Wn.2d 765, 771, 108 P.3d 753 (2005) (quoting In re Pers. Restraint of Orange, 152 Wn.2d 795, 815, 100 P.3d 291 (2004)).

To do so here, we must first determine, given that the jury did not specify the basis for its verdict on the first degree murder charge, what type of murder

12

No. 83280-8-I/13

Heng was convicted of committing. Heng contends that, applying the rule of lenity, we must assume that he was convicted of felony murder predicated on the same arson that was the basis for the arson conviction. The State concedes this point, and we accept the State's concession. See State v. Deryke, 110 Wn. App. 815, 824, 41 P.3d 1225 (2002) ("Principles of lenity require us to interpret [an] ambiguous verdict in favor of [the defendant]."). Accordingly, our task is to determine whether the legislature intended to allow the trial court to punish Heng for both felony murder predicated on arson and the underlying arson.

Courts follow four analytical steps to determine whether the legislature intended to authorize cumulative punishment. First, we consider "any express or implicit legislative intent." State v. Arndt, 194 Wn.2d 784, 816, 453 P.3d 696 (2019). " 'If there is clear legislative intent to impose multiple punishments for the same act or conduct, this is the end of the inquiry and no double jeopardy violation exists.' " Id. (quoting State v. Kelley, 168 Wn.2d 72, 77, 226 P.3d 773 (2010)). If legislative intent is unclear, we proceed to the second step of the test and apply the Blockburger,[7] or "same evidence," test. Id. Under Blockburger, " '[w]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.' " Id. at 818 (internal quotation marks and emphasis omitted) (quoting Orange, 152 Wn.2d at 817).

---

[7] Blockburger v. United States, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932).

13

If <u>Blockburger</u> is not dispositive, the third step of the analysis calls for application of the "merger doctrine." <u>Id.</u> at 816. " 'Under the merger doctrine, when the degree of one offense is raised by conduct separately criminalized by the legislature, we presume the legislature intended to punish both offenses through a greater sentence for the greater crime,' " and not separately. <u>Id.</u> at 819 (quoting <u>Freeman</u>, 153 Wn.2d at 772-73). Thus, "a lesser included offense merges 'into a more serious offense when a person is charged with both crimes, so that the person is not subject to double jeopardy.' " <u>Muhammad</u>, 194 Wn.2d at 618 (quoting BLACK'S LAW DICTIONARY at 1184 (11th ed. 2019)).

Finally, in the fourth step of the analysis, we consider "any independent purpose or effect that would allow punishment as a separate offense." <u>Arndt</u>, 194 Wn.2d at 816. "[W]hen overlapping offenses have independent purposes or effects," the offenses do not merge, and "separate punishments are allowed." <u>Id.</u> at 819.

If legislative intent to allow separate punishments can be found in any of the four steps of the analysis, then there is no double jeopardy violation. <u>Id.</u> at 818.

Here, the parties agree with regard to the first three steps of the analysis that (1) there is no express or implied articulation of legislative intent, (2) felony murder predicated on arson is the same offense as the underlying arson under <u>Blockburger</u>, and (3) arson is a lesser included offense of felony murder predicated on arson. Heng contends, as to the fourth step of the analysis, that felony murder and its predicate felony can never be independent so as to satisfy

14

the exception to the merger doctrine. The State counters that because the arson in this case had an effect independent of the murder, the two offenses do not merge. We agree with the State.

Arndt is instructive. There, Shelly Arndt set fire to a house that had eight people in it, including the O'Neils, who owned the home, and Arndt's boyfriend, Darcy Veeder Jr. Id. at 790. Everyone escaped except Veeder, whose body was found in the living room. Id. at 791. Arndt was later convicted of aggravated first degree murder with the aggravating circumstance of first degree arson, as well as first degree arson. Id. at 791-92, 796.

On appeal, our Supreme Court rejected Arndt's contention that the trial court placed her in double jeopardy by punishing her twice for the same arson: once as an aggravator to first degree murder and again for the arson itself. See Id. at 821. It held that the independent purpose or effect exception applied, explaining, "Arndt was charged with aggravated first degree murder for the death of a single victim, Darcy Veeder Jr. In contrast, her conviction for first degree arson, in addition to resulting in the death of Veeder, also destroyed the O'Neils' home and was 'manifestly dangerous' to the other occupants." Id. at 819 (quoting RCW 9A.48.020(1)(a)). The court concluded, "The presence of additional victims places this case inside the 'independent effect' exception to the merger doctrine that allows for the imposition of separate punishments." Id.

In addition to considering the fact that Arndt's arson had victims other than Veeder, the Supreme Court observed that "an independent purpose exists on an abstract level that also prevents the merger of the two offenses and allows for the

15

imposition of multiple punishments." Id. at 819-20. Specifically, "the two statutes in question are located in different chapters of the criminal code and are intended to protect different societal interests." Id. at 820. "Because the primary purpose of the arson statute is to protect property, it is located in chapter 9A.48 RCW (consisting of offenses primarily intended to protect property)." Id. "In contrast, because the primary purpose of the aggravated murder statute is to protect human life, aggravated first degree murder is found in two different chapters dedicated to this end, chapter 9A.32 RCW (Homicide) and chapter 10.95 RCW (Capital punishment—Aggravated first degree murder)." Id. "This provides an additional indication that the legislature clearly intended separate punishments for the crimes of aggravated first degree murder with an arson aggravator and of first degree arson." Id. Thus, the court held, "the two crimes do not merge and the imposition of multiple punishments does not violate double jeopardy." Id.

Here, as in Arndt, while Heng was charged with felony murder for the death of a single victim, Hooser, his arson had victims in addition to Hooser— namely, the owners of the Sifton Market, who also owned the building, and the owners of the other businesses that were destroyed by the fire. Under Arndt, the impact of Heng's arson on these additional victims places this case within the "independent effect" exception to the merger doctrine that allows for separate punishments.

Additionally, felony murder is found in chapter 9A.32 RCW, which the Supreme Court observed in Arndt is a chapter dedicated to protecting human life. Id.; see also RCW 9A.32.030(1)(c) (defining first degree felony murder). The fact

16

that arson is, by contrast, found in a chapter consisting of offenses primarily intended to protect property "provides an additional indication that the legislature clearly intended separate punishments" for first degree arson and for felony murder predicated on first degree arson. Arndt, 194 Wn.2d at 820.

In short, Arndt controls. Applying Arndt, we hold that because Heng's arson had an effect independent of the murder and because the purpose of criminalizing arson is to protect property whereas the purpose of criminalizing murder is to protect human life, this case falls within the "independent purpose or effect" exception to the merger doctrine. Therefore, allowing both of Heng's convictions to stand does not place him in double jeopardy.

Heng does not meaningfully address Arndt in his briefing. At oral argument, Heng argued that Arndt is distinguishable because it involved an aggravator to murder rather than felony murder.[8] But it would be illogical to conclude that although the legislature "clearly intended" to punish arson separately as a property crime even when it elevates a resulting homicide via an aggravator, the legislature did not intend to do so when it elevates a resulting homicide via the felony murder statute.

Heng also argued that Arndt is distinguishable because there, "the fact that there were other victims was pled and proved to the jury."[9] He asserted that

---

[8] Wash. Court of Appeals oral argument, State v. Heng, No. 83280-8-I (Jan. 20, 2022), at 2 min., 16 sec. through 3 min., 30 sec., video recording by TVW, Washington State's Public Affairs Network, https://www.tvw.org/watch/?clientID=9375922947&eventID=2022011103.

[9] Wash. Court of Appeals oral argument, supra, at 4 min., 35 sec. through 4 min. 42 sec.

17

No. 83280-8-I/18

here, by contrast, the prosecutor "never said anything [in closing] about the fire potentially damaging anybody else's property or harming anyone else" other than Hooser.[10]

Heng is incorrect. That Heng *set fire to the building*—which undisputedly was owned by someone other than Hooser—was part and parcel of the State's arson case as presented to the jury. Consistent with that theory, the prosecutor argued at closing, "Of course, *lighting a building on fire* with a person in it is manifestly dangerous to human life. And we know that *in the building at the time*, there was a human being and Ms. Hooser was not a participant in the crime." (Emphasis added.) The State did not present any theory to the jury on which it could have convicted Heng of arson in the first degree based on facts that did not involve a separate and distinct injury to something or someone other than Hooser.[11] See In re Pers. Restraint of Knight, 196 Wn.2d 330, 338, 473 P.3d 663 (2020) (independent purpose or effect exception is satisfied when the crime " 'injure[s] the person or property of the victim or others in a separate and distinct manner from the crime for which it also serves as an element' " (internal quotation marks omitted) (quoting Arndt, 194 Wn.2d at 819)); cf. State v. Kier, 164 Wn.2d 798, 812-13, 194 P.3d 212 (2008) (where assault elevated robbery to

---

[10] Wash. Court of Appeals oral argument, supra, at 7 min., 30 sec. through 7 min. 39 sec.

[11] Consider, in contrast, a theory under which no building was involved and Heng instead killed Hooser by setting fire to Hooser's own vehicle with Hooser in it. As the State acknowledged at oral argument, under such a theory, the arson would not have had an effect independent of the murder, and the exception to the merger doctrine likely would not apply. See Wash. Court of Appeals oral argument, supra, at 11 min., 35 sec. through 12 min, 47 sec.

18

first degree, the two offenses merged because the jury instructions specified

Ellison as the victim of the assault but the jury could have found that the victim of

the robbery "was Hudson or Ellison, or both," i.e., the jury could have found that

both the assault and the robbery affected only a single victim).  Heng's attempts

to distinguish Arndt fail.

Heng also contends that Muhammad is the controlling case here, not

Arndt.[12]  But whether two offenses merge depends in large part "on the facts of

the individual case," Freeman, 153 Wn.2d at 779, and Muhammad is readily

distinguishable on its facts.

In Muhammad, Bisir Muhammad was convicted of felony murder

predicated on rape for sexually assaulting Ina Richardson and strangling her to

death.  See 194 Wn.2d at 614.  On appeal, Muhammad, who was also convicted

of the underlying rape, argued that the trial court placed him in double jeopardy

by punishing him twice for a single rape.  Muhammad, 194 Wn.2d at 616.  Our

Supreme Court agreed, explaining that no exception to the merger doctrine

applied because "[t]he exception to the merger rule and felony murder are

irreconcilable and cannot coexist."  Id. at 626.  The court reasoned,

> When a person negligently or accidentally kills somebody in the
> course of, in furtherance of, or in flight from a robbery, rape,
> burglary, arson, or kidnapping, that person *by definition* did not
> commit the underlying crime to facilitate murder.  It was an
> accident, albeit a criminal one.  When it comes to felony murder,
> the lesser offense does not—and cannot—have a purpose

---

[12] See Wash. Court of Appeals oral argument, supra, at 3 min., 30 sec. through 3 min., 40 sec.

No. 83280-8-I/20

> independent from the greater; the purpose of the entire criminal
> endeavor is to commit the underlying felony.

Id.

To be sure, the language from Muhammad is broad, and it is unsurprising that Heng relies on it. But again, merger involves a fact-specific inquiry. See State v. Saunders, 120 Wn. App. 800, 821, 86 P.3d 232 (2004) ("Courts apply an exception to th[e] merger doctrine on a case-by-case basis; it turns on whether the predicate and charged crimes are sufficiently 'intertwined' for merger to apply." (quoting State v. Johnson, 92 Wn.2d 671, 681, 600 P.2d 1249 (1979)). In Muhammad, the rape that served as the predicate for felony murder could have had only one victim—the same victim as the murder. See 194 Wn.2d at 628 ("The underlying rape was intertwined with the killing—the jury necessarily found that the killing occurred in the course of, in furtherance of, or in immediate flight from th[e] rape and all its horrible effects."); cf. State v. Tili, 139 Wn.2d 107, 119, 985 P.2d 365 (1999) (unit of prosecution for rape is each instance of sexual intercourse). By contrast, arson by its nature can have an independent effect on multiple victims, and it plainly did here. Cf. State v. Westling, 145 Wn.2d 607, 612, 40 P.3d 669 (2002) (unit of prosecution for arson is each fire, regardless the number of victims whose property is damaged); State v. Abdi-Issa, 199 Wn.2d 163, 171, 504 P.3d 223 (2022) (where pet owner was "directly harmed as a result of [the defendant]'s violent killing of her beloved pet and companion," she was "plainly a victim" of animal cruelty even though the subject of the cruelty was the animal itself). So, even though Muhammad was a felony murder case like this

20

No. 83280-8-I/21

one, we are not persuaded that it controls where, as here, the predicate offense could and did independently affect victims other than the victim of the murder.

Heng's double jeopardy claim fails.

Bail Amount

Heng next contends that, by setting bail at $2 million and doing so without applying the factors set forth in CrR 3.2,[13] the trial court violated CrR 3.2 and denied Heng his constitutional right to be free from excessive bail. The State counters that Heng's contention is moot. We agree with the State.

---

[13] Under CrR 3.2(c), "the court shall, on the available information, consider the relevant facts" in determining "which conditions of release will reasonably assure the accused's appearance," including but not limited to:

(1) The accused's history of response to legal process, particularly court orders to personally appear;

(2) The accused's employment status and history, enrollment in an educational institution or training program, participation in a counseling or treatment program, performance of volunteer work in the community, participation in school or cultural activities or receipt of financial assistance from the government;

(3) The accused's family ties and relationships;

(4) The accused's reputation, character and mental condition;

(5) The length of the accused's residence in the community;

(6) The accused's criminal record;

(7) The willingness of responsible members of the community to vouch for the accused's reliability and assist the accused in complying with conditions of release;

(8) The nature of the charge, if relevant to the risk of nonappearance;

(9) Any other factors indicating the accused's ties to the community.

The rule also imposes a rebuttable presumption of release in noncapital cases, CrR 3.2(a), and states that, "[i]f the court determines that the accused is not likely to appear if released on personal recognizance, the court shall impose the least restrictive of [the conditions provided in the rule] that will reasonably assure that the accused will be present for later hearings." CrR 3.2(b).

"An issue is moot if we can no longer provide effective relief." State v. Ingram, 9 Wn. App. 2d 482, 490, 447 P.3d 192 (2019). As we explained in Ingram, we cannot provide effective relief with regard to a pretrial bail issue to an appellant who has been convicted because "pretrial bail is no longer available to him." Id.; see also Murphy v. Hunt, 455 U.S. 478, 483-84, 102 S. Ct. 1181, 71 L. Ed. 2d 353 (1982) (conviction moots claim that pretrial bail was excessive). While we recognize that bail setting issues are of public interest and likely to recur, Heng does not argue that any exception to the mootness doctrine applies. Cf. Ingram, 9 Wn. App. 2d at 490 (reviewing a moot bail setting issue because it involved a matter of continuing and substantial public interest, including because the issue was public in nature and likely to recur). In any case, recent published case law has provided guidance on the issues that Heng raises in this appeal. See Ingram, 9 Wn. App. 2d at 489 n.12, 493-97 (evaluating trial court's application of CrR 3.2); State v. Huckins, 5 Wn. App. 2d 457, 465-69, 426 P.3d 797 (2018) (same). We need not address them again.[14]

### Right to Counsel

Heng next contends that his preliminary appearance was a critical stage of trial. Thus, he asserts, the trial court deprived him of his constitutional right to

---

[14] Because we conclude that Heng's challenges to the bail amount are moot, we also need not address the State's argument that Heng failed to preserve those challenges for review.

22

counsel by proceeding in counsel's absence, and this was a structural error requiring automatic reversal. We disagree.

"Under both the Washington and United States Constitutions, a criminal defendant is entitled to the assistance of counsel at critical stages in the litigation." State v. Heddrick, 166 Wn.2d 898, 909, 215 P.3d 201 (2009); U.S. CONST. amend. VI; WASH. CONST. art. 1, § 22. "A critical stage is one 'in which a defendant's rights may be lost, defenses waived, privileges claimed or waived, or in which the outcome of the case is otherwise substantially affected.' " Id. at 910 (quoting State v. Agtuca, 12 Wn. App. 402, 404, 529 P.2d 1159 (1974)). It includes "those pretrial procedures that would impair defense on the merits if the accused is required to proceed without counsel." Gerstein v. Pugh, 420 U.S. 103, 122, 95 S. Ct. 854, 43 L. Ed. 2d 54 (1975); see also Satterwhite v. Texas, 486 U.S. 249, 257, 108 S. Ct. 1792, 100 L. Ed. 2d 284 (1988) (critical stage is one where counsel's absence "affect[s]—and contaminate[s]—the entire criminal proceeding"). "A complete denial of counsel at a critical stage of the proceedings is presumptively prejudicial and calls for automatic reversal." Heddrick, 166 Wn.2d at 910.

Here, Heng's preliminary appearance was limited in scope: Heng confirmed his name and date of birth, and the court appointed counsel and set bail, indicating that it would be willing to revisit the issue later. Heng did not forfeit any rights or defenses that would substantially affect the outcome of his trial. Although the trial court did set bail, it also indicated it would be willing to revisit the issue later, and Heng could have asked the court to do so at any time.

23

See CrR 3.2(j)(1) ("At any time after the preliminary appearance, an accused who is being detained due to failure to post bail may move for reconsideration of bail."). Thus, Heng's counsel's absence did not cause Heng to waive any right related to bail, nor did counsel's absence "by [its] very nature cast so much doubt on the fairness of the trial process that, as a matter of law, [it] can[not] be considered harmless." See Satterwhite, 486 U.S. at 256. For the foregoing reasons, we conclude that Heng's preliminary appearance was not a critical stage of trial such that counsel's absence therefrom requires automatic reversal. Cf. In re Pers. Restraint of Sanchez, 197 Wn. App. 686, 702, 391 P.3d 517 (2017) (arraignment not a critical stage of trial where petitioner made no showing "that any right or defense he possessed prearraignment was forfeited or went unpreserved by his attorney's absence at arraignment").

Heng disagrees and relies on three United States Supreme Court cases for the proposition that his preliminary appearance was a critical stage because the trial court set bail during the proceeding.[15] First, Heng cites Coleman v. Alabama, 399 U.S. 1, 90 S. Ct. 1999, 26 L. Ed. 2d 387 (1970), for the proposition that "[a] 'critical stage' includes preliminary hearings at which bail decisions are made." But the preliminary hearing in Coleman was a hearing the primary purpose of which was to "determine whether there is sufficient evidence against the accused to warrant presenting his case to the grand jury." Id. at 8. In concluding that the hearing was a critical stage, the Court did observe that

---

[15] We need not address the nonbinding state and lower federal court cases on which Heng also relies.

No. 83280-8-I/25

counsel could be influential at such a hearing in making arguments about bail.

Id. at 9. However, the Court's focus was on the ways counsel's presence at the

hearing would affect the ultimate outcome *of the trial*. Specifically, the Court also

observed that

> the lawyer's skilled examination and cross-examination of
> witnesses may expose fatal weaknesses in the State's case that
> may lead the magistrate to refuse to bind the accused over. . . . [I]n
> any event, the skilled interrogation of witnesses by an experienced
> lawyer can fashion a vital impeachment tool for use in cross-
> examination of the State's witnesses at the trial, or preserve
> testimony favorable to the accused of a witness who does not
> appear at the trial. . . . [T]rained counsel can more effectively
> discover the case the State has against his client and make
> possible the preparation of a proper defense to meet that case at
> the trial.

Id.; see also id. at 12 (Black, J., concurring) ("[T]he preliminary hearing is a

'critical stage' of the proceedings during which the accused must be afforded the

assistance of counsel *if he is to have a meaningful defense at trial* as guaranteed

in the Bill of Rights." (emphasis added)). Coleman did not hold that counsel's

absence at a bail setting alone requires automatic reversal. Indeed, despite

concluding that the preliminary hearing at issue therein was a critical stage of

trial, the Coleman court remanded to the state court to determine whether the

absence of counsel at the hearing was prejudicial. See id. at 10-11. Heng's

reliance on Coleman is misplaced.

Heng's reliance on Hamilton v. Alabama, 368 U.S. 52, 82 S. Ct. 157, 7 L.

Ed. 2d 114 (1961), is similarly misplaced. Heng cites Hamilton for the

proposition that his bail setting was "the kind of adversarial proceeding[ ] where

counsel's guiding hand is constitutionally required." In Hamilton, the Court held

25

that "[a]rraignment *under Alabama law* is a critical stage in a criminal proceeding." Id. at 53 (emphasis added). This was because, at an Alabama arraignment, "[a]vailable defenses may be as irretrievably lost, if not then and there asserted, as they are when an accused represented by counsel waives a right for strategic purposes." Id. at 54. Hamilton does not control here because, as discussed, Heng does not show that he irretrievably lost any privilege or defense at his preliminary appearance.

Finally, Rothgery v. Gillespie County, 554 U.S. 191, 128 S. Ct. 2578, 171 L. Ed. 2d 366 (2008), also does not control. There, the sole question was when the Sixth Amendment right to counsel *attaches* such that the State has a "consequent . . . obligation to appoint counsel within a reasonable time once a request for assistance is made." Id. at 198. The Court expressly recognized that the question of whether a particular proceeding signals attachment of the right to counsel " 'is distinct from the question whether the [proceeding] itself is a critical stage requiring the presence of counsel.' " Id. at 212 (quoting Michigan v. Jackson, 475 U.S. 625, 629 n.3, 106 S. Ct. 1404, 89 L. Ed. 2d 631 (1986), overruled on other grounds by Montejo v. Louisiana, 556 U.S. 778, 129 S. Ct. 2079, 173 L. Ed. 2d 955 (2009)). Rothgery has no bearing on our inquiry here.

In short, Heng fails to persuade us that his preliminary appearance was a critical stage of trial requiring automatic reversal due to counsel's absence. Thus, assuming it was nonetheless an error of constitutional magnitude for the trial court to set bail in counsel's absence, we must still determine whether that error requires reversal.

26

It does not.  A constitutional error does not require reversal where it is harmless beyond a reasonable doubt.  State v. Vazquez, 200 Wn. App. 220, 225, 402 P.3d 276 (2017).  Here, as discussed, Heng could have asked the trial court to revisit bail at any time.  Indeed, even Heng concedes that the trial court "repeatedly said [it] would completely reconsider bail once counsel was involved."  Under these circumstances, counsel's absence when bail was *initially* set was harmless beyond a reasonable doubt.[16]  Heng suggests that he was prejudiced to the extent that counsel did not in fact ask the trial court to revisit bail and, as a result, he remained in custody.  But any prejudice resulting from the fact that counsel did not ask the trial court to revisit bail does not go to Heng's right-to-counsel claim.  It goes to his ineffective assistance claim, which we address next.

Ineffective Assistance of Counsel

Heng argues that his defense counsel was ineffective for not asking the trial court to revisit bail.  We disagree.

The Sixth Amendment to the United States Constitution and article 1, section 22 of the Washington State Constitution guarantee the right to effective assistance of counsel.  In re Pers. Restraint of Brett, 142 Wn.2d 868, 873, 16 P.3d 601 (2001).  "A claim of ineffective assistance of counsel is an issue of constitutional magnitude that may be considered for the first time on appeal."

---

[16] Heng asserts that the absence of counsel at his initial appearance violated not only his constitutional right to counsel but also his right to counsel under CrR 3.1(b)(1).  Because Heng does not separately analyze this rule-based claim, neither do we.  See State v. C.B., 195 Wn. App. 528, 535, 380 P.3d 626 (2016) (we will not review issues inadequately argued or mentioned only in passing).  Nevertheless, any error under CrR 3.1(b)(1) would also be harmless.

27

State v. Salas, 1 Wn. App. 2d 931, 949, 408 P.3d 383 (2018). To prevail on a claim of ineffective assistance, a defendant must establish that (1) his attorney's performance was deficient and (2) the deficiency prejudiced him. State v. Kyllo, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). Heng establishes neither.

*Heng Does Not Establish Deficient Performance*

"To prevail on an ineffective assistance claim, a defendant alleging ineffective assistance must overcome 'a strong presumption that counsel's performance was reasonable.' " State v. Grier, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011) (quoting Kyllo, 166 Wn.2d at 862). "[A] criminal defendant can rebut the presumption of reasonable performance by demonstrating that 'there is no conceivable legitimate tactic explaining counsel's performance.' " Id. (quoting State v. Reichenbach, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)).

Here, Heng asserts that given the trial court's failure to consider the factors set forth in CrR 3.2, there was no conceivable reason counsel would not "at least try" to ask the court to revisit bail and try to secure Heng's pretrial release. But as the State points out, it is at least conceivable that counsel reasonably believed the court would not have lowered bail or released Heng even upon consideration of the CrR 3.2 factors. Cf. Strickland v. Washington, 466 U.S. 668, 691, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) ("[W]hen a defendant has given counsel reason to believe that pursuing certain [strategies] would be fruitless or even harmful, counsel's failure to pursue those [strategies] may not later be challenged as unreasonable."). Heng points to nothing in this record to show otherwise, and we will not presume deficient performance from a

28

silent record.  See State v. McFarland, 127 Wn.2d 322, 336, 899 P.2d 1251 (1995) ("Because the presumption runs in favor of effective representation, the defendant must show in the record the absence of legitimate strategic or tactical reasons supporting the challenged conduct by counsel.").

*Heng Does Not Show Prejudice*

Independently fatal to his ineffective assistance claim, Heng does not show that he was prejudiced by counsel's decision not to ask the court to revisit bail.

To establish prejudice resulting from counsel's allegedly deficient performance, Heng must "prove that there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different."  Kyllo, 166 Wn.2d at 862.  Heng correctly points out that the reasonable probability standard does not require proof on a "more likely than not" basis.  State v. Jones, 183 Wn.2d 327, 339, 352 P.3d 776 (2015).  Nevertheless, the probability must be " 'sufficient to undermine confidence in the outcome.' " Grier, 171 Wn.2d at 34 (quoting Strickland, 466 U.S. at 694).  Heng "must affirmatively prove prejudice and show more than a 'conceivable effect on the outcome' to prevail."  State v. Estes, 188 Wn.2d 450, 458, 395 P.3d 1045 (2017) (internal quotation marks omitted) (quoting State v. Crawford, 159 Wn.2d 86, 99, 147 P.3d 1288 (2006)).

Heng does not satisfy this standard.  He asserts that "[h]ad counsel raised the issue [of bail] and argued the requirements of CrR 3.2, there is more than a reasonable probability that the court would have eliminated or significantly

29

reduced the 'bail' " such that he would have been released pretrial. But Heng's assertion that there was a reasonable probability of a different bail outcome is entirely conclusory. While he points out that the trial court repeatedly indicated it would reconsider bail, this shows, at most, that it is *conceivable* that counsel might have affected the outcome. It does not establish *a reasonable probability* that Heng—who does not dispute he is indigent—could have posted even a reduced bail, much less that the trial court would have released him after considering all of the factors set forth in CrR 3.2.

Heng also asserts that "[t]he prejudice is especially acute here, because the State used calls Mr. Heng made while in jail as evidence against him at trial." But any prejudice from the statements Heng made on those calls was the product of Heng's decision to make those statements despite warnings he was being recorded. That prejudice cannot be laid at counsel's feet.

Heng's ineffective assistance claim fails.

<u>Anderson's Testimony</u>

Finally, Heng argues that the trial court erred under ER 702 by admitting Anderson's testimony that a fire originated on or near Hooser's body. We disagree.

ER 702 provides, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." "Expert testimony is usually admitted under ER 702 if it will be helpful to the jury in

understanding matters outside the competence of ordinary lay persons."

Anderson v. Akzo Nobel Coatings, Inc., 172 Wn.2d 593, 600, 260 P.3d 857

(2011). "Unreliable testimony does not assist the trier of fact and is properly

excluded under ER 702." In re Det. of McGary, 175 Wn. App. 328, 339, 306 P.3d

1005 (2013). We review a trial court's evidentiary rulings under ER 702 for

abuse of discretion. Arndt, 194 Wn.2d at 797. " 'A trial court abuses its

discretion when its decision is manifestly unreasonable or exercised on

untenable grounds or for untenable reasons.' " Id. at 799 (quoting State v. Lord,

161 Wn.2d 276, 283-84, 165 P.3d 1251 (2007)).

Here, Heng contends that Anderson's testimony should have been

excluded as unreliable because Anderson did not follow NFPA 921 in reaching

her conclusion that a fire originated on or near Hooser's body. The State

counters, as an initial matter, that because Heng invoked only Frye below and

did not mention ER 702, we should consider his ER 702 argument waived. The

State is correct that Heng's counsel did not refer specifically to ER 702 when

objecting to Anderson's testimony. Instead, counsel appears to have conflated

the Frye analysis with the ER 702 analysis, arguing that Anderson's investigation

was a novel scientific theory subject to a Frye analysis because it was a

"conclusive statement" based on nothing more than "an eyeball analysis without

any testing." But despite this conflation, the clear thrust of counsel's argument

was that Anderson's testimony was inadmissible because it was unreliable.[17]

---

[17] Heng does not renew the Frye aspect of his argument on appeal.

Thus, we do not consider that argument waived. We do, however, conclude that the argument is without merit.

Heng relies on Arndt and Lakey v. Puget Sound Energy, Inc., 176 Wn.2d 909, 296 P.3d 860 (2013), for the proposition that Anderson's testimony was inadmissible because she did not follow NFPA 921. But in Arndt, "there was *no dispute* at trial that fire causation *must be determined* using the NFPA 921 origin and cause methodology." 194 Wn.2d at 802 (emphasis added). Given the lack of any dispute in this regard and the "large degree of freedom" a trial court is given in determining whether testimony will assist the trier of fact, our Supreme Court held that it was not an abuse of discretion to exclude certain testimony that did not comport with NFPA 921 as unreliable. Id. at 799, 802. In Lakey, our Supreme Court held that it was not manifestly unreasonable for the trial court to exclude an expert's testimony linking electromagnetic fields to disease given that the expert's "admission that he selectively used data created the appearance that he attempted to reach a desired result, rather than allowing the evidence to dictate his conclusions." 176 Wn.2d at 921.

Although both Arndt and Lakey held that it was not an abuse of discretion to exclude the challenged testimony, neither held, as Heng suggests, that it also would have been an abuse of discretion to *admit* the testimony and subject it to cross examination. Cf. State v. Gentry, 125 Wn.2d 570, 586, 888 P.2d 1105 (1995) (whether a generally accepted methodology was followed on a given occasion goes to weight, not admissibility). And neither holds that testimony regarding the origin of a fire is per se unreliable if it does not comport with

32

NFPA 921. Heng fails to show that the trial court abused its discretion by admitting Anderson's testimony merely because Anderson did not follow NFPA 921.

To the contrary, Anderson was undisputedly qualified as an expert by her training and experience as a fire marshal. The trial court was within its discretion to conclude that Anderson's testimony based on her training, experience, and observations of the scene would be helpful to the jury. Furthermore, any error in admitting Anderson's testimony that a fire originated on or near Hooser's body was harmless. Another fire marshal, Curtis Eavenson, also testified that on a more probable than not basis, "another ignition was at least attempted" near Hooser's body. Heng did not object to Eavenson's testimony, and Heng himself admitted to setting a fire in another part of the Sifton Market. Reversal is not required. Cf. Brown v. Spokane County Fire Prot. Dist. No. 1, 100 Wn.2d 188, 196, 668 P.2d 571 (1983) (erroneous admission of merely cumulative evidence was harmless).

We affirm.

_Smith, A.C.J._

WE CONCUR:

_Andrus, C.J._

33